**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **Interstate Bakeries Corporation,** | ) | **Chapter 11** |
| **et al.,** | ) | |
| | ) | **Case No. 04-45814-11-JWV** |
| **Debtor.** | ) | |
| | ) | **Jointly Administered** |
| | ) | |
| **Lewis Brothers Bakeries** | ) | |
| **Incorporated and Chicago** | ) | |
| **Baking Company,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Adversary No. 08-4239-JWV** |
| **v.** | ) | |
| | ) | |
| **Interstate Brands Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**SUGGESTIONS IN SUPPORT OF DEFENDANT AND COUNTERCLAIM-PLAINTIFF
INTERSTATE BRANDS CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

Defendant and Counterclaim-Plaintiff Interstate Brands Corporation ("IBC"), for itself

and on behalf of its affiliates, including Hostess Brands, Inc. f/k/a Interstate Bakeries

Corporation ("Hostess"), hereby submits its Suggestions in Support of its Motion for Summary

Judgment.

**JURISDICTION AND BACKGROUND**

1.  The Court has jurisdiction over the claims raised in this adversary proceeding pursuant

to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding is a "core" proceeding within the

meaning of 28 U.S.C. § 157(b)(2).

2.  On September 22, 2004 (the "Commencement Date"), IBC and eight of its affiliates

filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code").  On January 14, 2006, another affiliate, Mrs. Cubbison's Foods, Inc. also filed a voluntary petition under chapter 11 of the Bankruptcy Code.

3.  On October 31, 2008, IBC and its affiliated debtors filed a joint plan of reorganization (bankr. doc. no. 11488) (the "Plan").

4.  On November 21, 2008, IBC filed an Amended Plan Exhibit O (Schedule of Assumed Unexpired Leases and Non-Union Executory Contracts) (bankr. doc. no. 11575) ("Amended Plan Exhibit").  The Amended Plan Exhibit is hereby incorporated by reference as if fully set forth herein.

5.  The Amended Plan Exhibit lists the License, identified below, as an executory contract.[1]  Amended Plan Exhibit p. 87.

6.  On December 1, 2008, Lewis Brothers Bakeries Incorporated and Chicago Baking Company (collectively, "LBB/CBC") filed their Complaint for Declaratory Judgment ("Complaint") commencing this adversary proceeding. The Complaint is hereby incorporated by reference as if fully set forth herein.

7.  On December 4, 2008, IBC filed its Motion for an Order Pursuant to 11 U.S.C. §§ 105 (a) and 365(a) Authorizing Rejection of a Certain License Agreement with Lewis Brothers Bakeries Incorporated and Chicago Baking Company (bankr. doc. no. 11670) (the "Motion"). The Motion is hereby incorporated by reference as if fully set forth herein.

8.  On December 5, 2008, this Court entered an order confirming the Plan, as amended (the "Confirmed Plan"). The Confirmed Plan is hereby incorporated by reference as if fully set forth herein.

---

[1] While IBC initially intended to assume the License, its Motion superseded the Amended Plan Exhibit and the License was never assumed under the Confirmed Plan.

DB02/804672.0004/8601015.7

9.  On January 8, 2009, IBC filed its Answer to the Complaint ("Answer"), in which it asserted a counterclaim for a declaratory judgment that the License is an executory contract and may be rejected. The Answer is hereby incorporated by reference as if fully set forth herein.

10.  On January 22, 2009, LBB/CBC filed their objection the Motion (bankr. doc. no. 11846) (the "Objection"). The Objection is hereby incorporated by reference as if fully set forth herein.

11.  On January 28, 2009, LBB/CBC filed their Answer to IBC's Counterclaim ("Answer to Counterclaim"). The Answer to Counterclaim is hereby incorporated by reference as if fully set forth herein.

12.  On August 28, 2009, this Court entered an Amended Pretrial Order and Notice of Trial (adv. doc. No. 25) which, among other things, administratively consolidated the contested matter created by the Motion with this Adversary Action.

## STATEMENT OF UNCONTROVERTED FACTS

### The Judgment

13.  On July 28, 1995, the United States District Court for the Northern District of Illinois ("District Court") entered a Final Judgment ("Judgment"), which states "Defendants [Interstate Bakeries Corporation and Continental Baking Company] are hereby ordered and directed within nine (9) months of entry of this Final Judgment, to grant to one or more purchasers a perpetual, royalty-free, assignable, transferrable, exclusive license to use the Relevant Labels to produce (or have produced for it) and sell White Pan Bread in the Relevant Territories . . . ."  Judgment Paragraph IV.A.  A true and correct copy of the Judgment is attached hereto as Exhibit A and is incorporated herein by reference.

DB02/804672.0004/8601015.7

14. The Judgment states "[u]nless this Court grants an extension, this Final Judgment will expire on the tenth anniversary of the date of its entry." Judgment Paragraph XII.

15. The Judgment did in fact expire on July 28, 2005, without any further action by the District Court. A true and correct copy of the Docket Sheet for the case involving the Judgment is attached hereto as <u>Exhibit B</u> and is incorporated herein by reference.

<u>The Transaction Pursuant to the Judgment — Asset Purchase Agreement</u>

16. On December 27, 1996, pursuant to the Judgment, IBC and LBB/CBC entered into a certain Asset Purchase Agreement ("Asset Purchase Agreement"). A true and complete copy of the Asset Purchase Agreement (without exhibits and schedules, which are available upon request) is attached hereto as <u>Exhibit C</u> and is incorporated herein by reference.

17. The Asset Purchase Agreement states "Seller shall sell, and Purchaser shall purchase, at the Closing . . . the Chicago Assets . . . ." Asset Purchase Agreement § 1.1.

18. The Asset Purchase Agreement states "The total purchase price for the Assets shall be an amount equal to Twenty Million Dollars ($20,000,000)", subject to certain adjustments. Asset Purchase Agreement § 2.1.

19. The Asset Purchase Agreement defines "Chicago Assets" to include seven parcels of real property, 23 leased properties, substantial machinery and equipment, and "the perpetual, royalty-free, assignable, transferrable, exclusive license to use the trademarks as described in Schedule 1.2(e) . . . pursuant to the terms of the License Agreement (as described in § 3.6) . . . . and the right to use during the period ending one (1) year after the Closing (as may be extended by mutual consent of the parties), Seller's Universal Product Codes ("UPC") in connection with the Trademarks licensed for use in the Chicago Territory pursuant to the terms of the License Agreement." Asset Purchase Agreement § 1.2(e).

4

20. The Asset Purchase Agreement states "[u]pon the terms and subject to the conditions contained in this Agreement, on the Chicago Transfer Date, Seller and Purchaser shall enter into a trademark license agreement substantially in the form of Exhibit G hereto . . . ." Asset Purchase Agreement § 3.6.

21. The Asset Purchase Agreement states "Schedule 1.2(e) is a complete and correct description of the nature of Seller's right, title or interest in the trademarks to be licensed to Purchaser for use in connection with the Chicago Business and the Sunbeam Business pursuant to the terms of the License Agreement and the products or product lines with respect to which each is used. The Trademarks are in all respects valid and in full force and effect." Asset Purchase Agreement § 6.11(a). A true and complete copy of Schedule 1.2(e) is attached hereto as <u>Exhibit D</u> and is incorporated herein by reference.

22. The Asset Purchase Agreement states "[t]his Agreement together with the exhibits and schedules hereto, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating thereto." Asset Purchase Agreement § 18.8.

<u>The Transaction Pursuant to the Judgment — License Agreement</u>

23. In connection with the Asset Purchase Agreement, IBC and LBB/CBC entered into a certain License Agreement ("License"). A true and complete copy of the License is attached hereto as <u>Exhibit E</u> and is incorporated herein by reference.

24. The License states "IBC is the owner of or has the right to use and sublicense to Licensee the trademarks, labels and logos and registrations thereof set forth in Schedule A hereto." License, first WHEREAS clause.

25. The License states "in order to comply with the Final Judgment entered in [the District Court action], IBC has agreed to extend a license to Licensee and Licensee desires to make use of the Trademarks subject to the terms and conditions set forth herein."  License, second WHEREAS clause.

26. The License Agreement states that it is not "sublicensable."  License § 1.1(a).

27. The License states that it is limited to "fresh and returned bread, buns, bread rolls and other bakery products."  License § 1.1(a).

28. The License states that it is limited to "only in that portion of the States of Illinois and Eastern Wisconsin as described in Exhibit A . . . ."  License § 1.1(a).

29. The License states "IBC expressly reserves from such license all rights and uses of the Chicago Trademarks outside the Chicago Territory."  § License 1.1(a).

30. The License states "IBC also expressly reserves from such license all rights and uses of the Chicago Trademarks in the Chicago Territory on products other than fresh and returned bread, buns, bread rolls and other bakery products."  License § 1.1(a).

31. The License states "[t]his license is limited to the Chicago Territory and licensee shall not have any rights in the Trademarks which are not expressly set forth herein."  License § 1.1(a).

32. The License states "IBC also reserves the rights to use the Trademarks only in connection with the marketing and sale of bakery products manufactured for IBC by LBB or delivered to IBC by LBB in its thrift stores located in the Chicago Territory and the Sunbeam Territory."  License § 1.1(a).

DB02/804672.0004/8601015.7

33. The License states "IBC further agrees to release all rights it may have to the Sunbeam Trademarks in the portion of the states described on Exhibit B hereto . . . ." License § 1.1(b).[2]

34. The License states "[t]his Agreement constitutes the legal, valid and binding obligations of IBC enforceable against IBC in accordance with its terms subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability affecting creditors' rights and to general equity principles." License § 1.3.

35. The License states "Licensee shall have no right to sublicense the Trademarks or the use of the Trademarks to any third party." License § 1.4.

36. The License states:

> Licensee acknowledges and agrees that IBC is the exclusive owner of or has the right to use, the Trademarks and all goodwill associated therewith and that IBC shall retain the full ownership interest in and to the Trademarks; the associated goodwill and all registrations granted thereon; and that all use of the Trademarks by Licensee shall inure to the benefit of and be available to IBC. Except for the rights specifically granted or licensed herein, Licensee shall have no rights to the Trademarks.

License § 2.1.

37. The License states "Licensee shall not anywhere register, or cause to be registered, any corporate logo, name or trademark consisting of, comprising or containing the Trademarks, including without limitation any registration in the United States Patent and Trademark Office." License § 2.2.

38. The License states "Licensee shall not contest the title of IBC to the Trademarks or registrations thereof or challenge the validity of this Agreement and Licensee shall not take any

---

[2] As noted in the License, IBC was only a licensee of the Sunbeam trademarks and therefore simply "released" its rights to LBB/CBC. Accordingly, that portion of the License Agreement relating to the Sunbeam trademarks is not within the scope of IBC's Motion to reject the License.

action or fail to take any action the result of which could reasonably foreseeably adversely prejudice IBC's interest in the Trademarks."  License § 2.3.

39.  The License states "Licensee shall use the Chicago Trademarks owned by IBC only in the form and manner and with appropriate legends as prescribed from time to time by IBC." License § 3.1.

40.  The License states "Licensee shall not use any of the Trademarks owned or licensed by IBC as its corporate name or title in whole or in part and shall not, without the prior written consent of IBC, alter or combine such owned or sublicensed Trademarks with other terms, or use such Trademarks in connection with any business other than as licensed hereunder."  License § 3.2.

41.  The License states "IBC shall have the right to terminate this Agreement in the event of the material breach of any of the terms hereof by Licensee . . . .  A material breach shall include but not be limited to a failure of LBB to maintain the character and quality of goods sold under the Trademarks as provided for in Section 6.1 hereof."  License § 5.2.

42.  The License states "[u]pon the termination of this Agreement pursuant to Sections 1.2 or 5.2, Licensee shall cease and terminate all use of any kind whatsoever of the Trademarks. Licensee shall not replace the Trademarks with any other words, logos or phrases confusingly similar thereto."  License § 5.3.

43.  The License states:

> Goods sold or otherwise distributed by Licensee under the Trademark shall be substantially of the same character and quality as the goods currently sold by IBC under the Trademarks . . ..  Licensee shall use raw materials, ingredients and packaging supplies of a quality at least as high and consistent with the quality previously used by IBC in connection with the same or similar products.

License § 6.1.

44.  The License states:

DB02/804672.0004/8601015.7

**Claims Against Third Parties**.  "Licensee and IBC shall each notify the other of any actual, alleged or threatened infringement of rights under the Trademarks in the Territory by any third party promptly as it comes to the attention of Licensee or IBC, as the case may be.  IBC shall have the sole discretion at its own cost and expense, to bring proceedings involving the Trademarks in its own name and to join Licensee as a party against any third party infringing either directly or contributorily. If IBC should determine to bring such suit, all recovery shall be retained by IBC.  Licensee shall reasonably assist IBC as requested and cooperate in any such litigation at IBC's expense; provided, however, IBC shall have full control over the conduct of the suit, including the right to select counsel of its choice and enter into any settlement of the suit provided that such settlement does not materially prejudice Licensee's rights hereunder.

License § 7.1.

45.  The License states:

**Claims by Third Parties**.  Licensee and IBC shall promptly notify each other of all information as it comes into their possession relative to any actual or threatened infringement suit by third parties in relating to Licensee's use of the Trademarks.  IBC shall have the sole right, but not the obligation, to control at its own cost and expense the defense of such suit, including but not limited to the right to select counsel of its choice and enter into any settlement of the suit provided that such settlement does not materially prejudice Licensee's rights hereunder.

License § 7.2.

46.  The License states:

**No Warranty For Claims by Third Parties**.  IBC has the right to use and license others to use the Trademarks it owns in the manner contemplated by this Agreement; however, IBC specifically disclaims any warranty that Licensee will be free from claims of third parties with respect to the Trademarks.  Licensee acknowledges that it has no right to indemnification from IBC as a result of any third party challenges to Licensee's use of the Trademarks hereunder.  Subject to the preceding sentence, IBC shall defend, indemnify and hold Licensee harmless against any and all claims, demands, causes of action, judgments, cost and expenses, including reasonable attorney's fees, arising out of any willful act or omission by IBC with respect to any of its obligations under this Agreement.

License § 8.1.

47.  The License states:

**Indemnification of IBC by Licensee**.  Licensee shall defend, indemnify and hold IBC harmless against any and all claims, demands, causes of action, judgments,

9

cost and expenses, including reasonable attorney's fees arising out of Licensee's manufacture, distribution, shipment, advertising, promotion, offering for sale or sale of the goods sold under the Trademarks, or any defects and such goods other than those supplied by IBC to Licensee, as well as related advertising and promotional materials, provided Licensee receives prompt notice of such claim, demand, cause of action or judgment and is permitted a deal with it in Licensee's sole discretion.

License § 8.2.

48. The License states "[t]his Agreement, together with the Exhibits and Schedules hereto and the agreements referenced herein, constitute the entire agreement between the parties respecting the subject matter hereof and supersedes all prior written or oral agreements or understanding in variation of its terms." License § 9.1.

49. The License states "[e]xcept expressly set forth herein, this Agreement shall not be modified, altered or amended except by Agreement in writing signed by duly authorized representatives of the parties hereto." License § 9.2.

50. The License states that "[t]his Agreement shall be governed by the statutory and decisional law of the State of Illinois . . . ." License § 9.3.

51. The License states "[e]xcept as otherwise specifically provided herein, no failure or delay on the part of any party hereto to enforce any provision of this Agreement or to exercise any right granted hereby shall operate as a waiver thereof unless or until the right to enforce any such provision or to exercise any such right has been waived in writing by such party." License § 9.5.

52. Schedule A to the License identifies further limitations on the use of certain trademarks, including but not limited to limiting the use of the "Gingham Design" to "only in connection with Butternut and Mrs. Karl's trademarks" and use of the "Old World" trademark for "bagels only." License, Schedule A.

53. Schedule A to the License specifically identifies one trademark as not owned by IBC, and instead provides for IBC to "abandon" its rights to use said trademark.  License, Schedule A.

54. Schedule B to the License states "IBC will be obligated to release or abandon rights to certain third party Trademarks in the Sunbeam Territory." License, Schedule B.

<u>The Transaction Pursuant to the Judgment — Supply Agreement</u>

55. In connection with the Asset Purchase Agreement, IBC and LBB/CBC entered into a certain Supply Agreement ("Supply Agreement").  A true and complete copy of the Supply Agreement is attached hereto as <u>Exhibit F</u> and is incorporated herein by reference.

56. The Supply Agreement generally allows IBC and LBB/CBC to sell certain products to each other during the first year after closing under the Asset Purchase Agreement.  Supply Agreement §§ 1.2, 2.1-2.2.

57. The Supply Agreement states "[a]ny Butternut Brand Products purchased pursuant to this Section 2.1 shall only be sold by LBB in the Chicago Territory in accordance with the terms of the License Agreement.  LBB shall not sell any Butternut Brand Products to any third party which LBB knows or has reason to know intends to resell such products outside the Chicago Territory." Supply Agreement § 2.1(a).

58. The Supply Agreement states:

Butternut Brand Products and Sunbeam Brand Products sold pursuant to Article II above, shall be of the same character and quality as the products currently sold in the business of IBC and such present character and quality shall be considered an acceptable standard of quality.  No substantial change in the character or quality of the Butternut Brand Products or the Sunbeam Brand Products shall be made by a party without first notifying the other.  IBC reserves the right to change, modify or alter the formula, ingredients or packaging of the Butternut Brand Products and to discontinue any of the products in the Butternut Brand Products or Sunbeam Brand Products line.

Supply Agreement § 3.1.

DB02/804672.0004/8601015.7

<u>The Transaction Pursuant to the Judgment — Allocation Agreement</u>

59.  In connection with the Asset Purchase Agreement, IBC and LBB/CBC entered into a certain Allocation Agreement ("Allocation Agreement").  A true and complete copy of the Allocation Agreement is attached hereto as <u>Exhibit G</u> and is incorporated herein by reference.

60.  The Allocation Agreement indicates that the purchase price of $20 million under the Asset Purchase Agreement (exclusive of inventory), was allocated among the parties in the amount of $11,880,000 to various tangible assets (such as land, buildings and equipment) and the balance of $8,120,000 to "Intangibles (including the Trademark License)."   Allocation Agreement § 3.

<u>The Transaction Pursuant to the Judgment – Amendment to Asset Purchase Agreement</u>

61.  In connection with the Asset Purchase Agreement, IBC and LBB/CBC entered into a certain Amendment to Asset Purchase Agreement and Schedules and Exhibits ("Amendment"). A true and complete copy of the Amendment is attached hereto as <u>Exhibit H</u> and is incorporated herein by reference.

62.  The Amendment states various amendments to the License Agreement.  Amendment, Article IV.

63.  The Amendment also states certain amendments to the Supply Agreement regarding the sale of certain "fresh" and "stale" products between IBC and LBB/CBC.  In this regard, the Amendment states "[t]he sale of fresh and/or stale for thrift sale will not transfer any trademark rights or franchise rights to geographic territory for either Seller or Purchaser.  This will apply to Hostess, Dolly Madison and Buttermaid (doughnuts, sweet rolls, danish) and Blue Seal which are Seller labels and Purchaser will have in license, rights to these trade names."  Amendment § 5.1(a).

DB02/804672.0004/8601015.7

<u>Relevant Communications After the Transaction Pursuant to the Judgment</u>

64.  Between the closing of the Transaction and mid-1998, IBC and LBB/CBC exchanged letters modifying the geographic areas covered by the License Agreement.  True and complete copies of the letters are attached collectively hereto as <u>Exhibit I</u> and are incorporated herein by reference.

65.  On October 14, 1998, IBC sent a letter to LBB/CBC regarding certain Italian bread packaging.  A true and complete copy of the letter is attached hereto as <u>Exhibit J</u> and is incorporated herein by reference.

66.  On or about November 15, 2001, IBC sent LBB/CBC a letter regarding termination of the UPC numbers affiliated with the License pursuant to the Asset Purchase Agreement.  A true and compete copy of the letter is attached hereto as <u>Exhibit K</u> and is incorporated herein by reference.

67.  In May, 2004, LBB/CBC and IBC exchanged correspondence regarding certain alleged violations of trademarks and trade names by IBC.  True and complete copies of the letters are attached collectively hereto as <u>Exhibit L</u> and are incorporated herein by reference.

68.  As of the date of the deposition of Roger Lesh of LBB/CBC on September 22, 2009, LBB/CBC maintained a web site containing separate entries for the trademarks that LBB/CBC owned and the trademarks that LBB/CBC licensed.  A true and complete copy of the relevant page of the web site is attached hereto as <u>Exhibit M</u> and is incorporated herein by reference.

<u>The Principal Trademarks</u>

69.  One of the principal trademarks included in the License is registered with the United States Patent and Trademark Office ("PTO") under registration number 072110. A true and

compete copy of the registration and related information is attached hereto as <u>Exhibit N</u> and is incorporated herein by reference.

70. Another of the principal trademarks included in the License is registered with the PTO under registration number 0543840. A true and compete copy of the registration and related information is attached hereto as <u>Exhibit O</u> and is incorporated herein by reference.

71. A third principal trademark included in the License is registered with the PTO under registration number 1015409. A true and compete copy of the registration and related information is attached hereto as <u>Exhibit P</u> and is incorporated herein by reference.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper where the pleadings, discovery and affidavits show there is no genuine issue as to any material fact.  Fed. R. Bankr. P. 7056, incorporating Fed. R. Civ. P. 56(c); *see*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In considering a motion for summary judgment, the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.  *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998).  Rather, viewing the evidence in the light most favorable to the non-moving party, the court views the facts and evidence as a whole.  *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 845 (8th Cir. 2006).  The party opposing summary judgment must set forth specific facts showing there is a genuine issue of material fact for trial.  *Celotex Corp.*, 477 U.S. at 324.  Mere allegations, unsupported by specific facts or evidence beyond the non-moving party's own conclusions, are insufficient to withstand a motion for summary judgment.  *See id*.

DB02/804672.0004/8601015.7

## ARGUMENTS AND AUTHORITIES

IBC requests the Court enter an order declaring that the License is an executory contract and IBC may properly reject it under § 365 of the Bankruptcy Code.  This requires a two-part inquiry.  First, the Court must determine whether the License is an executory contract.  Then, if the Court finds that the License is executory, it must determine whether IBC exercised reasonable business judgment in deciding to reject the License.  The facts in this case are undisputed and these inquiries involve questions of law.  As set forth below, the law is clear that, based on the uncontroverted facts of this case, there is no question that the License is an executory contract and IBC exercised reasonable business judgment in deciding to reject the License.

## I.    THE LICENSE IS AN EXECUTORY CONTRACT

The Complaint filed by LBB/CBC states, in relevant part, that "IBC cannot reject or assume and assign the [License] because it is not an executory contract within the meaning of 11 U.S.C. § 365."  Complaint ¶ 19.  For the reasons set forth below, the License is an executory contract and may be rejected by IBC accordingly.

## A.    Trademark Licenses Are Executory Contracts

Under 11 U.S.C. § 365 a debtor-in-possession "may assume or reject any executory contract or unexpired lease . . . ."  While the Bankruptcy Code does not define "executory contract," the legislative history is clear that "it generally includes contracts on which performance remains due to some extent on both sides."  11 U.S.C. § 365 cmt.; *see also* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 347 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 58 (1978).

In the Eighth Circuit, courts evaluate whether a contract is executory under the standard set forth by Professor Vern Countryman in 1973 (the "Countryman Standard").  *See In re Farmland Indus., Inc.*, 294 B.R. 903, 922 (Bankr. W.D.Mo. 2003); *Northwest Airlines, Inc. v. Klinger (In re Knutson)*, 563 F.2d 916, 917 (8th Cir. 1977) (quoting Vern Countryman, *Executory Contracts in Bankruptcy:  Part I*, 57 Minn. L. Rev. 439, 460 (1973)).  Under the Countryman Standard, a contract is executory when

> ". . . the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."

Vern Countryman, *Executory Contracts in Bankruptcy:  Part I*, 57 Minn. L. Rev. 439, 460 (1973).  In evaluating a contract under the Countryman Standard the court must determine "whether both parties have unperformed material obligations under the [a]greement."  *In re Exide Techs., Inc.*, 340 B.R. 222, 229 (Bankr. D. Del. 2006) *aff'd, EnerSys Delaware, Inc. v. Exide Techs. Inc.,* 2008 WL 522516, Case No. 02-11125 (D. Del. Feb. 27, 2008).  To determine whether an obligation is material requires the court look to applicable non-bankruptcy law; specifically, courts apply contract principles under relevant state law.  *Id.*

The License is governed by Illinois law, under which a material obligation is an important or substantial obligation, the breach of which entitles the non-breaching party to damages.  *See Mayfair Constr. Co. v. Waveland Assocs. Phase I Ltd. P'ship,* 619 N.E.2d 144, 154 (Ill. App. Ct. 1993); *Anderson v. Long Grove Country Club Estates, Inc.*, 249 N.E.2d 343, 349-50 (Ill. App. Ct. 1969).  While Illinois courts have not expressly defined "material obligation," they have universally adopted the Countryman Standard for determining whether a contract is executory.  *See*, *e.g.*, *In re Liquidation of Inter-American Ins. Co. of Illinois*, 768 N.E.2d 182, 191 (Ill. App. Ct. 2002); *In re Liquidation of Inter-American Ins. Co. of Illinois,* 707

N.E.2d 617, 619 (Ill. App. Ct. 1999). Thus, cases interpreting license agreements under this standard are highly persuasive.

Courts applying the Countryman Standard generally hold that license agreements are executory contracts within the meaning of § 365 of the Bankruptcy Code. *See, e.g., Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.)*, 89 F.3d 673 (9th Cir. 1996); *Fenix Cattle Co. v. Silver (In re Select-a-Seat Corp.)*, 625 F.2d 290 (9th Cir. 1980); *In re Exide Techs.*, 340 B.R. 222 (Bankr. D. Del. 2006) *aff'd, EnerSys Delaware, Inc. v. Exide Techs. Inc.,* 2008 WL 522516, Case No. 02-11125 (D. Del. Feb. 27, 2008); *In re HQ Global Holdings, Inc.*, 290 B.R. 507 (Bankr. D. Del. 2003); *In re Golden Books Family Entm't, Inc.*, 269 B.R. 300 (Bankr. D. Del. 2001); *In re Access Beyond Techs., Inc.*, 237 B.R. 32 (Bankr. D. Del. 1999); *In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561 (Bankr. W.D. Wash. 1983).

The seminal case of *In re Exide Techs.*, 340 B.R. 222 (Bankr. D. Del. 2006), *aff'd, EnerSys Delaware, Inc. v. Exide Techs. Inc.,* 2008 WL 522516, Case No. 02-11125 (D. Del. Feb. 27, 2008), is almost factually identical to this adversary proceeding/contested matter. In *Exide Techs.*, the debtor, Exide Technologies, Inc. ("Exide"), sold its industrial battery division to EnerSys Delaware, Inc. ("EnerSys") in 1991 and entered into several agreements in connection with the transaction, including a license agreement and an asset purchase agreement. *Id*. EnerSys paid Exide more than $135 million upon closing. *Id*. at 227-28. In 2002, Exide filed its Chapter 11 bankruptcy and sought to reject the license agreement as an executory contract. *Id*. at 228. EnerSys objected, arguing that the agreement was not executory and that Exide had not used reasonable business judgment in electing to reject the agreement. *Id*. at 228-29.

The court reviewed the obligations of each party under the license agreement to determine which obligations were material. *See id*. at 229-39. First, the court reviewed Exide's

obligation to allow EnerSys to use the trademarks set forth in the agreement and its obligation

not to prosecute EnerSys for use of these trademarks, holding this was a material obligation. *Id*.

at 234 ("a 'licensor's promise to refrain from suing the licensee for infringement is the *raison*

*d'etre* for a [trademark] license.'") (quoting *Everex Sys., Inc.*, 89 F.3d at 677).   In reviewing the

requirement that EnerSys maintain certain quality standards in its use of the trademarks, the

court found that this was a material obligation. *Id*. at 232-33.   In addition, the court found that

Exide's agreement not to grant licenses to third parties in the same area was a material obligation.

*Id*. at 235.   ("Indeed, Exide agreed not to grant any licenses to third parties which would be

inconsistent with EnerSys's use of the mark.   This agreement, in and of itself, is a material

obligation of Exide.")   Finally, the court found that ongoing obligations to indemnify the other

party were material for both Exide and EnerSys.   *Id*. at 237.   The court then rejected EnerSys's

argument that these obligations were substantially performed, finding that both Exide and

EnerSys remained obligated to perform several of these material obligations.   *Id*. at 238.

Accordingly, the court granted Exide's motion to reject the license agreement as an executory

contract. Other issues raised by LBB/CBC also are addressed in this case and discussed below.

Similarly, in *Fenix Cattle Co. v. Silver (In re Select-a-Seat Corp.)*, 625 F.2d 290 (9th Cir.

1980), the trustee of debtor Select-a-Seat Corporation ("Select-a-Seat") sought to reject a license

agreement with Fenix Cattle Company ("Fenix") as an executory contract under § 365 of the

Bankruptcy Code.   *Fenix Cattle Co. v. Silver (In re Select-a-Seat Corp.)*, 625 F.2d 290, 291 (9th

Cir. 1980).   The agreement granted Fenix the use of and license to Select-a-Seat's software

packages in several areas around the world.   *Id*.   Under the agreement, Select-a-Seat agreed not

to provide the software to other parties for ten years.   *Id*.   Fenix agreed to pay Select-a-Seat

$140,000 plus five percent of its net annual income from the use of the software packages.   *Id*.

DB02/804672.0004/8601015.7

Fenix argued that the agreement was not an executory contract as Fenix had received the software packages upon the initial $140,000 payment. *Id*. at 292. The bankruptcy court rejected this argument, found that the agreement was a burdensome executory contract, and granted the trustee's motion to reject the agreement, which was subsequently affirmed by the district court. *Id*. at 291-92. The Ninth Circuit Court of Appeals affirmed, holding that both Fenix's obligation to make continued payments to Select-a-Seat, and Select-a-Seat's obligation not to sell its software packages to other parties, were material obligations. *Id*. at 292 ("Violation of this obligation would be a material breach of the licensing agreement.").

The bankruptcy court reached the same result in *In re HQ Global Holdings, Inc.*, 290 B.R. 507 (Bankr. D. Del. 2003), where the debtor filed a motion to reject certain license agreements with its franchisees. *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 508-09 (Bankr. D. Del. 2003). The license agreements granted the franchisees exclusive rights to use "trade names, trademarks, service marks, logos, emblems, insignia, and other indicia of origin" owned by the debtor. *Id*. at 509. After reviewing the agreements, the court found that the franchisees had continuing material obligations to keep centers open in licensed territories, pay monthly royalties, and submit monthly operating reports to the debtor. *Id*. at 510. The debtor was required to forbear from using the trademarks in the licensed territories, an obligation the court concluded was material. *Id*. at 510-11. The court authorized the rejection of the license agreements as executory contracts. *Id*. at 511.

**B.      Both Parties Have Unperformed Material Obligations Under the License**

To fully appreciate the executory nature of the License in question, one must first understand that trademarks arise from, and only continue to exist due to, their continuous <u>use</u> in

connection with a business, and maintenance of a certain standard of <u>quality</u> affiliated with the

trademark. One commentator aptly summarized relevant trademark law as follows:

> Trademarks – words, phrases, logos and symbols that producers use to identify their goods and services – are protected by both federal law (the Lanham Act) and state law.
>
> These marks are essential to many business forms. Franchising is perhaps the most vivid example. The McDonald's or Subway restaurant chains are built upon the assurance to consumers that they will receive a particular quality of goods at restaurants bearing the associated trademark….
>
> For these reasons, trademark law has highly developed jurisprudence surrounding trademark licensing. Due to the distinctive nature of trademarks as a means for communicated the source of goods and services, trademarks cannot be transferred as simply as a patent or copyright. As the Supreme Court observed long ago, "There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption…." United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90 (1918)….
>
> [A]ny license of trademarks – whether exclusive or nonexclusive – must be supervised by the trademark owner in order to avoid abandoning the mark. *See* Gorenstein Enters v. Quality Care-USA, Inc., 874 F.2d 431, 435 (7th Cir. 1989). The Lanham Act requires trademark licensors to control "the nature and quality of the goods or services" sold by licensees. *See* 15 U.S.C. §§ 1055, 1127 [definition of "abandoned"] [cits. omit].

Menell, *Bankruptcy Treatment of Intellectual Property Assets: An Economic Analysis*, 22

Berkeley Tech. L.J. 733 (2007).

> The leading treatise on trademark law discusses the same concepts as follows:
>
> A trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark. [cit. omit]…As has been remarked: "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark….For this purpose, the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain. [cit. omit]…
>
> Thus, not only does the trademark owner have the right to control quality, when it licenses, it has the duty to control quality…"The owner of a trademark has a duty

to ensure the consistency of the trademarked good or service. If he does not fulfill that duty, he forfeits the trademark….

Passage of the Lanham Act in 1946 firmly established the propriety of controlled licensing of trademarks. [cit omit]

If a licensee sells goods under the licensed trademark in breach of the licensor's quality specification, the licensee is liable for breach of contract as well as for trademark infringement. [cit. omit].

MCCARTHY ON TRADEMARKS, §18:42 (2008).

With this background, there is no question that the License is an executory contract under the Countryman Standard. Both IBC and LBB/CBC have continuing, material obligations under the License. It is undisputed that the License obligates IBC to do the following:

    a. maintain and defend the Trademarks[3];

    b. control the quality of the goods produced with the Trademarks[4];

    c. notify LBB/CBC of any actual, alleged or threatened infringement of the Trademarks[5];

    d. at IBC's discretion, maintain "full control" over any infringement actions[6];

    e. refrain from settling any infringement action in a manner that materially prejudice's LBB/CBC's rights under the License[7];

    f. refrain from suing LBB/CBC for trademark infringement;

    g. refrain from using the Trademarks in the Chicago Territory; and

    h. indemnify LBB/CBC "against all claims… arising out of any willful act or omission IBC with respect to any of its obligations under this Agreement."[8]

---

[3] Although not explicit in the License, it is inferred. MCCARTHY ON TRADEMARKS, §18.44 (2008)
[4] License §§ 3.1(a), 6.1 and 8.2. MCCARTHY ON TRADEMARKS, *supra*.
[5] License §§ 7.1 and 7.2
[6] License § 7.1
[7] License § 7.1
[8] License § 8.1

DB02/804672.0004/8601015.7

As to LBB/CBC, it is undisputed that the License obligates LBB/CBC to do the following:

a. refrain from sublicensing the Trademarks[9];

b. limit the use of the Trademarks to (a) the specified Territory, and (b) the specified "fresh and returned bread, buns, bread rolls, and other bakery products"[10];

c. refrain from registering the Trademarks, or contesting IBC's title to the Trademarks[11];

d. execute documents "to preserve and extend the Trademarks and registrations thereof within the Territory[12];

e. use the Trademarks "only in the form and manner and with appropriate legends as prescribed from time to time by IBC"[13];

f. not use the Trademarks "as its corporate name or title" and not alter or combine the Trademarks with other terms without the prior written consent of IBC, "or use such Trademarks in connection with any business other than as licensed hereunder"[14];

g. maintain the character and quality of all goods sold under the Trademarks[15];

h. notify IBC of any actual, alleged or threatened infringement of the Trademarks[16];

i. assist IBC in any infringement litigation[17]; and

---

[9] License §§ 1.1(a) and 1.4
[10] License § 1.1(a)
[11] License §§ 2.2 and 2.3
[12] License § 2.4
[13] License § 3.1(a)
[14] License § 3.2
[15] License §§ 5.2 and 6.1
[16] License §§ 7.1 and 7.2

DB02/804672.0004/8601015.7

> j. indemnify IBC for any and all actions arising out of LBB/CBC's use of the
> Trademarks[18].

When these obligations are compared to the obligations examined by the courts in *Exide Technologies*, *Fenix Cattle Co.*, and *HQ Global*, one must conclude that these obligations are material. IBC's obligation not to sue LBB/CBC for infringement and to not use the Trademarks in the Chicago Territory is the very reason for the existence of a license agreement; no obligation can be more material than this. *See Exide Techs.*, 340 B.R. at 234-35. In addition, courts consistently hold that indemnification obligations are material. *See*, *e.g.*, *id.* at 237. Finally, IBC's continuing obligation to notify LBB/CBC of infringement is material since infringement on the Trademarks threatens the very purpose of the License.

## C. *Exide Technologies* Is Well-Reasoned, Persuasive Authority

LBB/CBC state that "[*Exide Technologies*] is not controlling here and, in fact, affords little authority." Objection ¶ 17. In support of this position, LBB/CBC cite to Xuan-Thao Nguyen, *Selling It First, Stealing It Later:  The Trouble With Trademarks in Corporate Transactions in Bankruptcy*, 44 Gonz. L. Rev. 1 (2009) (hereinafter "Gonzaga Article"). The Gonzaga Article criticizes the ruling in *Exide Technologies,* arguing that the agreement was in fact a sale of the trademark and not a license. *See id.* at 19-20. However, the Gonzaga Article directly contradicts a long line of cases holding that license agreements are executory contracts, yet cites no relevant authority to support a different result. *See id.* at 24-30 (applying tax court decisions to the issue of whether a trademark license is a sale under the Bankruptcy Code). Moreover, this point was expressly raised and rejected in the *Exide Technologies* case, with the court noting the plain language of the license and the sophistication of both parties, who entered

---

[17] License, Section 7.1
[18] License, Section 8.2

DB02/804672.0004/8601015.7

into an arms-length transaction for the license. *See Exide Techs.*, 340 B.R. at 238-39. The Gonzaga Article then suggests what EnerSys and LBB/CBC could have done in these circumstances to achieve a different result: bargain for a "concurrent use" registration. *See* Gonzaga Article at 30-35. This issue was also addressed by the court in *Exide Technologies*, who found it persuasive that EnerSys had failed to bargain for anything more than a license of the trademark. *See Exide Techs.*, 340 B.R. at 238. The *Exide Technologies* decision was based on a careful review of the facts of that case, which facts are almost identical to the facts presented here and the court's reasoning was in line with well-established precedent. Thus, it is appropriate for this Court to follow the path set forth by the court in *Exide Technologies* and hold that the License is executory on identical grounds.

**D. Whether Material Obligations are Actually Performed is Irrelevant to Issue of Whether the License Is Executory**

In an attempt to downplay the material nature of the continuing obligations under the License, LBB/CBC argue that IBC has presented no evidence that the parties ever had to perform any obligations under the License. Objection ¶ 16. Not only is this irrelevant to the issue of whether the License is an executory (i.e. – unperformed) contract, but IBC has also performed (and continues to perform) many material obligations under the License. First and foremost, both IBC and LBB/CBC continue to <u>use</u> the Trademarks to this day (LBB/CBC inside the Territory and IBC outside the Territory), which is the cornerstone of maintaining a trademark.

Second, the parties performed many actions related to the License after the closing of the Transaction. For the first year after the closing, the parties operated under the Supply Agreement. *See* Exhibit F. Among other things, the Supply Agreement explicitly prohibited IBC and LBB/CBC from making any "substantial change in the character and quality of the Butternut Brand Products" without notifying the other party. Supply Agreement, §3.1. Over the

24

course of 1997 and 1998, the parties continued to modify the Territory covered by the License. *See* Exhibit I.  In October 1998, the parties communicated about IBC changing one of its trademarks otherwise being used in the Territory.  *See* Exhibit J.  In November 2001, IBC communicated with LBB/CBC about discontinuing use of UPC numbers on the goods manufactured under the License (almost 4 years beyond the 1 year period provided under the Asset Purchase Agreement, Section 1.2(e)).  *See* Exhibit K.  And in May 2004, the parties communicated about trademark and tradename issues affiliated with certain delivery dollies and bakery baskets.  *See* Exhibit L.

Third, IBC in fact continues to monitor the quality and packaging of the goods manufactured under the License. For example, IBC collects complaints from consumers that may relate to the goods manufactured under the License. In addition, IBC periodically reviews the packaging for the goods manufactured under the License. See Deposition of Richard Seban September 14, 2009 ("Seban Deposition"), attached as <u>Exhibit Q</u> hereto, 36:16-46:4, and 53:10-56:10.

Fourth, ongoing negative covenants (i.e. – covenants not to take certain actions) can constitute material executory obligations as much as affirmative covenants. For example, this Court previously has approved the rejection of employment agreements containing obligations to not disclose certain information and to not compete with the debtor by former senior officers of the debtor. *In re Farmland Indus.*, 294 B.R. at 922-923 . IBC's ongoing obligation not to use the Trademarks in violation of the License surely rises to the same level.

## II.    IBC EXERCISED REASONABLE BUSINESS JUDGMENT IN REJECTING THE LICENSE

After the Court determines the License is an executory contract, the second inquiry is whether IBC's decision to reject the License was a reasonable business judgment.  *See Exide*

*Techs.*, 340 B.R. at 239.  For the reasons set forth below, IBC exercised reasonable business judgment when it decided to reject the License.  Accordingly, the Court should determine that rejection of the License is authorized.

The traditional "business judgment" standard is the proper standard for evaluating a debtor's motion to reject an executory contract under § 365 of the Bankruptcy Code.  *See NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984) (citing *In re Minges*, 602 F.2d 38, 42-43 (2d. Cir. 1979)).  Since the Supreme Court's ruling in *Bildisco*, virtually all courts have applied the business judgment standard to motions to reject executory contracts.  *See*, *e.g.*, *In re Farmland Indus., Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003); *In re Exide Techs., Inc.*, 340 B.R. 222 (Bankr. D. Del. 2006); *In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991).

The business judgment standard shields a debtor's management from judicial second-guessing.  *In re Farmland Indus., Inc.*, 294 B.R. at 913 (citing *In re Johns-Manville Cop.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)).  Once the debtor articulates a valid business justification "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotations omitted); *see also In re Crystalin, L.L.C.*, 293 B.R. 455, 464 (8th Cir. B.A.P. 2003) (the court need not "place itself in the position of the trustee or debtor-in-possession.").  When this standard is applied to § 365 of the Bankruptcy Code, "[i]t is enough if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate."  *In re Minges*, 602 F.2d at 43; *see also In re Farmland Indus., Inc.*, 294 B.R. at 913) (all that is required is a showing by the debtor that "the action to be taken will benefit the estate.")  If the debtor's business judgment has been reasonably exercised, a court

should approve the assumption or rejection of an executory contract. *See, e.g.*, *NLRB v. Bildisco and Bildisco*, 465 U.S. at 523; *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 318 U.S. 523 (1943); *Cleveland Hotel Protective Committee v. Nat'l City Bank of Cleveland (In re Van Sweringen Corp.)*, 155 F.2d 1009, 1013 (6th Cir. 1946) *cert. denied*, 329 U.S. 766 (1946). Absent a showing of bad faith or gross abuse of business discretion, the court should not interfere with the debtor's business judgment. *In re Crystalin, L.L.C.*, 293 B.R. at 465 (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1047 (4th Cir. 1985)).

## A.    Rejection of the License Will Benefit the Estate

IBC's decision to seek rejection of the License was within its reasonable business judgment and satisfies the business judgment standard set forth in *Bildisco*. Rejection of the License will benefit the estate. First, rejection of the License will allow IBC to sell Butternut® products in the Chicago Territory. LBB/CBC sold between $20 million and $30 million of Butternut® products in the Territory in 2008. See Deposition of Roger Lesh, September 22, 2009 ("Lesh Deposition"), attached as Exhibit R hereto, 14:9-14. In addition, rejection of the License will provide IBC with the ability to expand and develop its entire Butternut® brand both inside and outside the Chicago Territory. Finally, rejection of the License will benefit IBC's creditors by increasing the value of the equity interest transferred by IBC to the Creditors' Trust under the Confirmed Plan. For these reasons, the Court should find that rejection of the License is within the reasonable business judgment of IBC.

## B.    Rejection of the License Is Equitable

LBB/CBC argue in their Objection that IBC's request to reject the License is "inequitable and contradicts the principles of 11 U.S.C. § 365." Objection ¶ 19. First, such a finding

generally requires courts to find that rejection would provide no benefit to the estate. *See, e.g.,* *In re Bluman*, 125 B.R. 359, 363 (Bankr. E.D.N.Y. 1991) (rejection would provide no actual benefit to the debtor); *In re Matsusalem*, 158 B.R. 514, 522 (same); *In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561, 564 (Bankr. W.D. Wash. 1983) (rejection would not benefit a debtor who has continued to operate at a loss and would not succeed in new territory). Here, it is clear that IBC would gain a significant benefit from the use of the Trademarks in the Chicago Territory. LBB/CBC have put forth no evidence that would controvert the benefits to the estate. Second, several courts have declined to follow the *Bluman* case cited by LBB/CBC. *See, e.g.,* *In re Teligent, Inc.*, 268 B.R. 723 (Bankr. S.D.N.Y. 2001); *Towers v. Wu (In re Wu)*, 173 B.R. 411 (9th Cir. B.A.P. 1994). Third, *Bluman* clearly involves unrelated facts. In *Bluman*, the trustee for the debtor began collecting funds payable to the debtor under a purchase agreement. *Bluman*, 125 B.R. at 361. The debtor filed a motion to deem the purchase agreement rejected, and have the payments thereunder "abandoned" to the debtor, because the purchase agreement was an executory contract and was not affirmatively assumed within the 60 days specified under § 365(d)(1). *Id.* The court refused to compel rejection, finding that the noncompete provision that remained applicable to the debtor seven years after the contract was entered was not sufficiently material to satisfy the Countryman Standard, and the equities of the case were against the debtor. *Id.* at 362-363. The facts of *Bluman* could not be more different from the facts of this case. Here, IBC's executory obligations remain material, and the effect of allowing rejection will be a benefit to IBC and its creditors. Thus, it is clear that IBC exercised reasonable business judgment in deciding the reject the License and the Court should authorize its rejection.

### III.   LBB/CBC'S ARGUMENTS AGAINST REJECTION ARE UNSUPPORTED BY THE EVIDENCE AND THE RELEVANT LEGAL AUTHORITY

In its Objection, LBB/CBC assert two additional arguments as to why the Court should deny rejection of the License:  (1) the true intent of the parties was to treat the License as a sale of the Trademarks; and (2) IBC's rejection of the License would violate the Judgment.  Objection ¶¶ 12-15.  For the reasons set forth below, both arguments are without merit and should be rejected by the Court.

### A.      The License Was Not a Sale

First, LBB/CBC contend the License was a sale rather than a trademark license. Objection ¶ 12-13.  This argument is unsupported in either fact or law.  The License clearly states that IBC granted LBB/CBC "a perpetual, royalty-free, assignable, transferable, exclusive (but in no event sublicensable) license . . . . ."  License § 1.1(a).  Moreover, LBB/CBC expressly acknowledged "that IBC is the exclusive owner of . . . the Trademarks . . ." and "that IBC shall retain the full ownership interest in and to the Trademarks . . . ."  License § 2.1.  The terms of the License could not be more clear.

Second, the principal trademarks (see Exhibit D) are and have continuously been registered as owned by Hostess with the PTO.  *See* Exhibits N, O and P.  According to the registration information with the PTO, these trademarks have been in use by Hostess since 1902, 1947, and 1947, respectively. Moreover, these trademarks have been pledged as collateral to certain lenders pursuant to the Confirmed Plan. See the abstract of title included in Exhibits N, O and P.

Third, the License is a fully integrated agreement, which may not be contradicted by extrinsic evidence.  *See Eichengreen v. Rollins, Inc.,* 757 N.E.2d 952, 956 (Ill. App. Ct. 1992).  "Under the parol evidence rule, extrinsic or parol evidence concerning a prior or

contemporaneous agreement is not admissible to vary or contradict a fully integrated writing." *Id.* at 956 (citing *Geoquest Productions, Ltd. v. Embassy Home Entertainment,* 593 N.E.2d 1215, 1217 (Ill. App. Ct. 1994)). The meaning of the License therefore must be confined to the "four corners" of the document. *See Paul B. Episcope, Ltd. v. Law Offices of Campbell and Di Vincenzo,* 869 N.E.2d 784, 791 (Ill. App. Ct. 2007). The only evidence available to the Court, and the only evidence the Court should consider, is the License itself. It is clear from the face of the document that the License granted a trademark license to LBB/CBC.

Fourth, LBB/CBC's argument lacks legal support. Courts consistently reject the argument that these trademark licenses are sales. *See, e.g., Exide Techs.,* 340 B.R. at 238-39. In *Exide Technologies,* EnerSys argued that the trademark license was evidence of a "closed sale" and was therefore not an executory contract. *See id.* at 238. After first noting that the plain language of the document described it as a license and not a sale, the court stated that the license "was the result of an arm's-length transaction between two well-represented, sophisticated businesses." *Id.* The court concluded that the trademark license was a license and not a sale based on the plain language of the document. *Id.* at 239. In this case, IBC and LBB/CBC were sophisticated, well-represented parties who executed this License in an arms-length transaction. Moreover, LBB/CBC could have bargained for an assignment of the Trademarks, but the License is clear that they were only granted a license to the Trademarks. The Court should find that the plain language of the License is clear that no sale of the Trademarks occurred.

Last, LBB/CBC have continuously acknowledged on their website that the Trademarks are not owned by LBB/CBC. *See* <u>Exhibit O</u>; Lesh Deposition, 46:3-48:3. Accordingly, this Court should hold that the License was not a sale of the Trademarks.

**B.      Rejection of the License Will Not Violate the Judgment**

LBC/CBC argue that IBC's rejection of the License would violate the Judgment. Objection, paragraph 15. This is incorrect for two reasons.  First, the Judgment expired in 2005. Judgment Paragraph XII; Statement of Facts ¶ 15.  Second, the Judgment directed IBC "to grant to one or more purchasers a perpetual, royalty-free, assignable, transferrable, exclusive license to use the Relevant Labels to produce (or have produced for it) and sell White Pan Bread in the Relevant Territories . . . ."  Judgment Paragraph IV.A.  Noticeably absent from the Judgment is any requirement to *sell* the Trademarks to LBB/CBC.  Under the terms of the Judgment, IBC was only required to license the Trademarks to a third party.  Third, the case cited by LBB/CBC only holds that whether a contract is executory should be determined as of the Commencement Date, not that the consequence of rejection should relate back to the Commencement Date.  *See In re Newcomb*, 744 F.2d 621, 624 (8th Cir. 1984).  LBB/CBC's interpretation would mean that the parties to a rejected contract or lease would need to be put into the *status quo ante* as of the filing date which is contrary to § 365(g) of the Bankruptcy Code, discussed below, and would expose LBB/CBC and other non-debtor licensees to additional damages for any use of any rejected licensed rights after the filing date and prior to the rejection date.

**IV.    IBC IS ENTITLED TO SUMMARY JUDGMENT ON LBB/CBC'S AFFIRMATIVE DEFENSES**

In their Answer to Counterclaim, LBB/CBC assert the following seven affirmative defenses:  waiver, estoppel, recoupment, setoff, collateral estoppel, res judicata, and integrated agreement.  Answer to Counterclaim pp. 3-5.  There is no evidence to support these affirmative defenses. On the contrary, the uncontroverted evidence before the Court affirmatively shows LBB/CBC cannot succeed on any of these defenses.  Thus, it is appropriate for this Court to rule in favor of IBC and against LBB/CBC on each of the affirmative defenses.

A.      **The Allocation Agreement Has No Bearing on The Nature of the License**

LBB/CBC first argue that IBC has waived or is estopped from arguing the License is a trademark license.  They point to the Allocation Agreement as an affirmative admission that the License was a sale of the Trademarks.  This affirmative defense misstates the plain language of the documents and obvious intent of the parties.  First, the License is clear that it is not a sale of the Trademarks.  "IBC is the exclusive owner of . . . the Trademarks . . ." and "IBC shall retain the full ownership interest in and to the Trademarks . . . ."  License § 2.1  In addition, the Allocation Agreement's language clearly states that IBC and LBB/CBC "intend that such Allocation be binding on the parties to this Agreement for federal, state and local income tax purposes."  Allocation Agreement second WHEREAS clause.  The Allocation Agreement also states one of the assets purchased was "Intangibles (including the Trademark License)." Allocation Agreement § 3.  Finally, the Allocation Agreement states that IBC and LBB/CBC "agree to be bound by the Allocation for purposes of determining any income, gain, loss, depreciation or other deductions in respect of the Assets."  Allocation Agreement § 4.  The language of the Allocation Agreement is clear:  the parties only are bound by its terms for tax purposes.  In addition, even if the parties were bound by the Allocation Agreement's terms for all purposes, the language is clear that LBB/CBC bought a *trademark license*, not the Trademarks themselves.

In addition, the License and the Allocation Agreement are fully integrated agreements, which may not be contradicted by extrinsic evidence.  *See Eichengreen v. Rollins, Inc.,* 757 N.E.2d 952, 956 (Ill. App. Ct. 1992).  "Under the parol evidence rule, extrinsic or parol evidence concerning a prior or contemporaneous agreement is not admissible to vary or contradict a fully integrated writing."  *Id*. at 956 (citing *Geoquest Productions, Ltd. v. Embassy Home*

32

*Entertainment,* 593 N.E.2d 1215, 1217 (Ill. App. Ct. 1994)).  The meaning of the License and the

Allocation Agreement therefore must be confined to the "four corners" of the document.  *See*

*Paul B. Episcope, Ltd. v. Law Offices of Campbell and Di Vincenzo*, 869 N.E.2d 784, 791 (Ill.

App. Ct. 2007).  The only evidence available to the Court, and the only evidence the Court

should consider, are the language of the documents, which show only three things:  the License

was not a sale; the Allocation Agreement evidences the purchase of a *trademark license*; and the

Allocation Agreement is to be used to tax purposes only.  Because LBB/CBC are barred from

bringing forth any contrary evidence, none of which exists, it is appropriate for the Court to rule

in favor of IBC and against LBB/CBC on their affirmative defenses of waiver and estoppel.

## B.    Recoupment and Setoff Are Unavailable

LBB/CBC next argue that they are entitled, either under the doctrine of recoupment or

setoff, to continue to use the Trademarks after rejection to recover their damages.  This argument

appears to ignore the explicit provisions of the Bankruptcy Code regarding the effect of rejection

of an executory contract.  Under § 365(g) of the Bankruptcy Code, "the rejection of an executory

contract or unexpired lease of the debtor constitutes a breach of such contract . . . ."  Courts have

universally held that damages for a breach of contract under § 365(g) are limited to a general

unsecured prepetition claim.  *See*, *e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 512-13

(Bankr. D. Del. 2003); *Raima UK Ltd. v. Centura Software Corp. (In re Centura Software

Corp.)*, 281 B.R. 660, 674 (Bankr. N.D. Cal. 2002); NORTON, 6A NORTON BANKR. L. & PRAC.

2D § 150:18.

LBB/CBC may point to the language of § 365(n) of the Bankruptcy Code, which allows

licensees under contracts for a "right to intellectual property" to retain the rights to use such

property.  However, "intellectual property" is defined under § 101(35A) of the Bankruptcy Code,

and "trademarks" are noticeably absent.  Thus, § 365(n) does not apply to the License.  When a

DB02/804672.0004/8601015.7

statute is clear and unambiguous, "judicial inquiry is complete." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002).   Even if the Court considered legislative history here, Congress specifically withheld trademarks from protection under § 365(n) of the Bankruptcy Code, noting that "such contracts raise issues beyond the scope of this legislation."   S. Rep. No. 505, 100th Cong., 2d Sess. 5, 3206 (1978).[19]   As a result of the plain language of the statute, and its supporting legislative history, courts have consistently held that trademark licenses are not covered by § 365(n).  *See*, *e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 512-13 (Bankr. D. Del. 2003); *Raima UK Ltd. v. Centura Software Corp. (In re Centura Software Corp.)*, 281 B.R. 660, 674 (Bankr. N.D. Cal. 2002).

As a consequence, LBB/CBC are prohibited by statute from continuing to use the Trademarks after rejection under the doctrines of recoupment and setoff.   Instead, if LBB/CBC incur damages as a result of the rejection, they will be allowed to file a general unsecured claim for their damages resulting from IBC's breach.   Thus, it is appropriate for the Court to grant summary judgment in favor of IBC and against LBB/CBC on their affirmative defense of recoupment and setoff.[20]

## C.    IBC Treated the License as an Executory Contract in the Bankruptcy Case

LBB/CBC next argue that IBC is barred from arguing the License is an executory contract under the doctrines of collateral estoppel and res judicata.   They contend that, because IBC failed to list the License as an executory contract on its original Schedules and Statement of Financial Affairs filed in its bankruptcy case, IBC should be barred from claiming the License is

---

[19] Section 365(n) was enacted in 1988, and LBB/CBC should have been well aware of its limitation when they entered the License Agreement eight years later, particularly when Section 1.3 of the License states the License is "enforceable against IBC in accordance with its terms *subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability affecting creditors' rights...*"

[20] LBB/CBC might have provided for their desired outcome by taking a security interest in the Trademarks under the License to secure any damages arising from rejection of the License. However, LBB/CBC did not do so, and this Court should not in effect rewrite the License to cover their omission.

an executory contract.  Answer to Counterclaim p. 4.  Res judicata, or claim preclusion, protects against re-litigation of a previously adjudicated claim between the same parties.  However, a final judgment on the merits is a necessary prerequisite to the application of res judicata.  *See San Remo Hotel, L.P. v. San Francisco*, 545 U.S. 323, 336 n. 16 (2005); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979) ("Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.").  In this case, there has not been a final judgment on the merits on either LBB/CBC's claim that the License is not executory or on IBC's counterclaim that the License is executory.  Therefore, under the doctrine the res judicata, the claim has not been previously litigated and it is appropriate for this Court to grant summary judgment in favor of IBC and against LBB/CBC on their affirmative defense of res judicata.  In addition, IBC did list the License as an executory contract in its Amended Plan Exhibit.  Background ¶¶ 4-5.  Thus, there is neither legal support nor factual support for LBB/CBC's res judicata defense, and the same should be denied.

Similarly, the doctrine of collateral estoppel, or issue preclusion, which precludes the re-litigation in a second action "of issues actually litigated and necessary to the outcome of the first action," requires a final judgment on the merits.  *Parklane*, 439 U.S. at 326 n.5, *see San Remo Hotel*, 545 U.S. at 336 n. 16.  There is no evidence that the issue of whether the License is an executory contract has been previously litigated by either party to this adversary proceeding.  In addition, IBC did list the License as an executory contract in its Amended Plan Exhibit.  Background ¶¶ 4-5.  Thus, there is neither legal support nor factual support for LBB/CBC's collateral estoppel defense, and it is appropriate for this Court to grant summary judgment in favor of IBC and against LBB/CBC on their affirmative defense of collateral estoppel.

**D.    Regardless of Whether the License is Part of a Larger Agreement (the Asset Purchase Agreement), The License is the Only Executory Portion of the Agreement Remaining**

Finally, LBB/CBC argue that IBC cannot reject the License because it is part of an integrated agreement (i.e. – the Asset Purchase Agreement) and IBC should not be allowed to reject only one part of the agreement.   Answer to Counterclaim, ¶¶ 24-26.   This argument presumably flows from the principle that an executory contract must be assumed or rejected as a whole.   *See Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 41 (3d. Cir. 1989); *In re Teligent, Inc.*, 268 B.R. 723, 728 (Bankr. S.D.N.Y. 2001).   IBC respectfully disagrees.

First, the License Agreement stands on its own. It is a separate, executed document. It contains an integration clause.[21] It clearly involves separate and distinct rights and duties from the other provisions of the Asset Purchase Agreement. After the Closing, nothing in the License Agreement is contingent upon any other thing in any other document. And the consideration paid for the License was allocated by agreement of the parties in the Allocation Agreement.   Under these circumstances, the Eighth Circuit has rejected such an integration argument. *In re Craig*, 144 F.3d 593 (8th Cir. 1998).

However, it is not necessary for the Court to reach a conclusion on this issue, as IBC is entitled to reject all outstanding executory portions of the alleged integrated Asset Purchase Agreement.   The law is well-settled that where some portions of an agreement have been performed and other portions are executory, a debtor may reject the executory portions of the agreement.   *See In re Philadelphia Newspapers, LLC*, _ _ _ B.R. _ _ _, 2010 WL 231123, Case No. 09-11204 (Bankr. E.D. Penn. Jan. 13, 2010); *Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735 (5th Cir. 1996); *see generally Exide Techs.*, 340 B.R. 222

---

[21] License, Section 9.1

(authorizing rejection of the license portion of an integrated asset purchase agreement). This principle naturally flows from the concept that an agreement must be executory to be rejected under § 365 of the Bankruptcy Code. Where a portion of an integrated agreement is fully performed, such portion can no longer be assumed or rejected; the parties' obligations thereunder are complete. *See In re Philadelphia Newspapers, LLC*, _ _ _ B.R. _ _ _, 2010 WL 231123, Case No. 09-11204 (Bankr. E.D. Penn. Jan. 13, 2010). In *Philadelphia Newspapers*, the debtors sought to reject an asset purchase agreement and several related agreements under which the seller was required to maintain workers compensation insurance coverage and the debtors were required to reimburse the seller for pre-existing workers compensation claims. *Philadelphia Newspapers*, 2010 WL 231123 at *1-2. The seller objected to rejection of the asset purchase agreement, arguing that the debtors sought to reject only a part of an entire integrated agreement. The court rejected this argument, noting that "[t]he issue of assumption or rejection of such contracts relates only to those aspects of the contracts which remain unfulfilled as of the date the petition is filed." *Id*. at *3 (internal citations omitted). Finding that the asset purchase agreement had been substantially consummated, the court stated that what remained were the executory portions the debtors sought to reject. *Id*. ("Thus, where a single document embraces several distinct agreements, some of which are executory and some of which are fully or substantially performed, only the executory portions of the document are subject to rejection." (internal citations omitted)). The court authorized the debtors' rejection of the asset purchase agreement as an executory contract. *Id*. at *5.

In short, the License can be rejected by itself. And even if it is part of the Asset Purchase Agreement, it may be rejected as the only remaining executory obligation thereunder. Thus, it is

appropriate for this Court to grant summary judgment in favor of IBC and against LBB/CBC on this affirmative defense.

## **CONCLUSION**

For the reasons set forth herein, IBC is entitled to summary judgment, and requests that the Court enter summary judgment against LBB/CBC: (a) declaring that the License is an executory contract; (b) declaring that IBC used reasonable business judgment in deciding to reject the License; (c) authorizing IBC to reject the License; (d) rejecting LBB/CBC's affirmative defenses; and (e) granting such other and further relief as is just and proper.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By:    /s/ Paul M. Hoffmann
Paul M. Hoffmann MO # 31922
Nicholas J. Zluticky MO # 61203
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
phoffmann@stinson.com

ATTORNEYS FOR DEFENDANT AND
COUNTERCLAIM-PLAINTIFF

DB02/804672.0004/8601015.7

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 26th day of March, 2010, a true and correct copy of the foregoing document was filed electronically with the Clerk of the Court using the Court's CM/ECF system, which sent electronic notification to all parties participating in the CM/ECF system, and was sent via regular United States mail, postage prepaid, to all parties not receiving such notices.

      ___/s/ Nicholas J. Zluticky_____
      Attorneys for Defendant and
      Counterclaim-Plaintiff

DB02/804672.0004/8601015.7