**ASSET PURCHASE AGREEMENT**

**BETWEEN**

**INTERSTATE BRANDS CORPORATION ("SELLER")**

**AND**

**LEWIS BROTHERS BAKERIES INCORPORATED**

**AND**

**CHICAGO BAKING COMPANY (COLLECTIVELY "PURCHASER")**

**Dated December 27, 1996**

0251591.02

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A - General Description of Chicago Bakery

Exhibit B - Promissory Note

Exhibit C - Supply Agreement

Exhibit D - Right of First Refusal

Exhibit E - Technical Information and Confidentiality Agreement

Exhibit F - Allocation Agreement

Exhibit G - License Agreement

Exhibit H-1 and H-2 - Assignment and Assumption Agreements

Exhibit I-1 and I-2 - Vehicle Sublease

Exhibit J-1 and J-2 - Leases

Schedule 1.2(a) - Chicago Real Property

Schedule 1.2(b) - Chicago Equipment

Schedule 1.2(c) - Chicago Hardware

Schedule 1.2(d) - Chicago Software

Schedule 1.2(e) - Trademarks

Schedule 1.2(f)(i) - Chicago Owned Vehicles

Schedule 1.2(f)(ii) - Chicago Vehicle Leases

Schedule 1.2(p) - Chicago Assigned Leases

Schedule 1.2(q) - Chicago Assigned Contracts

Schedule 1.3(a) - Sunbeam Real Property

Schedule 1.3(b) - Sunbeam Equipment

Schedule 1.3(c) - Sunbeam Hardware

Schedule 1.3(d) - Sunbeam Software

Schedule 1.3(e)(i) - Sunbeam Owned Vehicles

Schedule 1.3(e)(ii) - Sunbeam Vehicle Leases

Schedule 1.3(o) - Sunbeam Assigned Leases

Schedule 1.3(p) - Sunbeam Assigned Contracts

Schedule 1.5 - Excluded Assets

Schedule 5.1 - Assumed Liabilities

Schedule 6.4 - Exceptions to Title

Schedule 6.7(d) - Environmental Remediation

Schedule 6.8 - Litigation

Schedule 6.12 - Labor Unions

Schedule 12.1(c) - Assumed Collective Bargaining Agreements

`

## TABLE OF CONTENTS

Page

ARTICLE I PURCHASE AND SALE OF ASSETS ..................................... 1
    Section 1.1    Assets Purchased .............................................. 1
    Section 1.2    Chicago Assets ............................................... 1
    Section 1.3    Sunbeam Assets .............................................. 3
    Section 1.4    Thrift Store Inventories ........................................ 6
    Section 1.5    Excluded Assets .............................................. 6

ARTICLE II PURCHASE PRICE ................................................. 6
    Section 2.1    Purchase Price ............................................... 6
    Section 2.2    Post-Chicago Transfer Date and Post-Closing Purchase
                 Price Adjustment ............................................. 7
    Section 2.3    Allocation of Purchase Price .................................... 8
    Section 2.4    Like-Kind Exchange .......................................... 9
    Section 2.5    Method of Payment ........................................... 9

ARTICLE III OTHER AGREEMENTS TO BE DELIVERED .......................... 9
    Section 3.1    The Note ................................................... 9
    Section 3.2    Supply Agreement ............................................ 9
    Section 3.3    Right of First Refusal ......................................... 9
    Section 3.4    Technical Information and Confidentiality Agreement ............... 10
    Section 3.5    Allocation Agreement ........................................ 10
    Section 3.6    License Agreement ........................................... 10
    Section 3.7    Assignment and Assumption Agreements .......................... 10
    Section 3.8    Vehicle Subleases ........................................... 10
    Section 3.9    Leases ..................................................... 10

ARTICLE IV THE CHICAGO TRANSFER DATE AND THE CLOSING ............... 10
    Section 4.1    Chicago Transfer Date ........................................ 10
    Section 4.2    The Closing ................................................ 11

ARTICLE V ASSUMPTION OF CERTAIN LIABILITIES ........................... 12
    Section 5.1    Liabilities Assumed .......................................... 12

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF SELLER ............... 12
    Section 6.1    Organization ................................................ 12
    Section 6.2    Authorization and Enforceability ................................ 12
    Section 6.3    Qualification as Foreign Corporation ............................ 13
    Section 6.4    Personal Property ............................................ 13
    Section 6.5    Title to Real Property ........................................ 13
    Section 6.6    Leases ..................................................... 13
    Section 6.7    Environmental Matters ........................................ 14
    Section 6.8    Litigation .................................................. 15
    Section 6.9    Compliance with Laws ........................................ 15

Section 6.10    Assigned Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Section 6.11    Trademarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Section 6.12    Labor Unions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Section 6.13    Payment of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Section 6.14    No Finder's or Broker's Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Section 6.15    Multiemployer Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE VII  REPRESENTATIONS AND WARRANTIES OF PURCHASER . . . . . . . . . . 17
Section 7.1     Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Section 7.2     Authorization and Enforceability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Section 7.3     Qualification as Foreign Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Section 7.4     Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Section 7.5     Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Section 7.6     No Finder's or Broker's Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE VIII  COVENANTS OF SELLER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Section 8.1     Management of the Assets and Conduct of the Sunbeam
                Business Pending the Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Section 8.2     Management of the Assets and Conduct of the Chicago
                Business After the Chicago Transfer Date and Prior to Closing . . . . . . . . . . . . 20
Section 8.3     Third Party Offers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Section 8.4     Access to Information and Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARTICLE IX  CONDITIONS TO OBLIGATIONS OF PURCHASER TO CLOSE . . . . . . . . 20
Section 9.1     Representations and Warranties True and Correct . . . . . . . . . . . . . . . . . . 20
Section 9.2     Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Section 9.3     Consents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Section 9.4     Title Insurance and Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Section 9.5     Environmental Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Section 9.6     No Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARTICLE X  CONDITIONS TO OBLIGATIONS OF SELLER TO CLOSE . . . . . . . . . . . . 21
Section 10.1    Representations and Warranties True and Correct . . . . . . . . . . . . . . . . . . 22
Section 10.2    Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Section 10.3    Consents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Section 10.4    No Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE XI  DELIVERIES TO BE MADE ON THE CHICAGO TRANSFER
            DATE AND AT THE CLOSING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Section 11.1    Condition Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Section 11.2    Deliveries by Seller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Section 11.3    Documents to be Delivered by Purchaser . . . . . . . . . . . . . . . . . . . . . . . . 23

ARTICLE XII  EMPLOYEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Section 12.1    Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Section 12.2    Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Section 12.3    Future Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Section 12.4   Employment Records ........................................... 25

ARTICLE XIII EMPLOYEE BENEFITS ........................................... 26
Section 13.1   Assumption of Seller's Plans ................................ 26
Section 13.2   Collectively Bargained Transferred Employees .................... 26
Section 13.3   Non-Collectively Bargained Transferred Employees ............... 27
Section 13.4   Welfare Benefit Obligations ................................ 28
Section 13.5   COBRA Obligations ........................................ 28
Section 13.6   Health and Dental Plan Provisions ............................ 28

ARTICLE XIV BULK TRANSFER: TAX CERTIFICATES .......................... 28

ARTICLE XV INDEMNIFICATION ............................................. 29
Section 15.1   Survival .................................................. 29
Section 15.2   Indemnification of Purchaser by Seller ......................... 29
Section 15.3   Indemnification of Seller by Purchaser ......................... 30
Section 15.4   Indemnification Procedure ................................... 30
Section 15.5   Effect of Insurance Payments ................................ 31
Section 15.6   Limitations on Indemnification ............................... 31

ARTICLE XVI TERMINATION ................................................ 31
Section 16.1   Termination by Either Party ................................. 31
Section 16.2   Effect of Termination ....................................... 32
Section 16.3   DOJ Caused Termination .................................... 33

ARTICLE XVII TRANSFER TAXES ........................................... 33

ARTICLE XVIII MISCELLANEOUS ........................................... 33
Section 18.1   Notices ................................................... 33
Section 18.2   Expenses ................................................. 34
Section 18.3   Public Announcement ...................................... 34
Section 18.4   Books and Records ........................................ 34
Section 18.5   Assignment ............................................... 34
Section 18.6   Governing Law ............................................ 34
Section 18.7   Waiver and Amendment ..................................... 34
Section 18.8   Entire Agreement .......................................... 34
Section 18.9   Knowledge ............................................... 34
Section 18.10  Confidentiality ............................................ 35
Section 18.11  Headings ................................................. 35
Section 18.12  Severability ............................................... 35
Section 18.13  Counterparts .............................................. 35

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is entered into as of the 27th day of December, 1996, between **INTERSTATE BRANDS CORPORATION**, a Delaware corporation ("Seller") and **LEWIS BROTHERS BAKERIES INCORPORATED**, a Missouri corporation ("LBB") and **CHICAGO BAKING COMPANY**, a wholly-owned subsidiary of LBB and an Illinois corporation ("CBC") (collectively LBB and CBC are referred to as "Purchaser").

## W I T N E S S E T H :

**WHEREAS,** Seller owns and operates a Butternut® bread bakery business from a baking facility described on Exhibit A (the "Chicago Bakery") located in Chicago, Illinois (the "Chicago Business");

**WHEREAS,** Seller also owns and operates a Sunbeam® and Purity bread business in central Illinois (the "Sunbeam Business");

.**WHEREAS,** in order to comply with the Final Judgment entered in the <u>United States of America v. Interstate Bakeries Corporation and Continental Baking Company</u> in the United States District Court in the Northern District of Illinois, Eastern Division; Civil Action No. 95 C 4194, Seller desires to sell and Purchaser desires to buy certain assets and assume certain liabilities of Seller related to the Chicago Business and the Sunbeam Business, all in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained herein, and intending to be legally bound, the parties hereto hereby agree to the following terms and conditions:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

**Section 1.1    Assets Purchased.** Subject to the terms and conditions of this Agreement, Seller shall sell, and Purchaser shall purchase, at the Closing (as defined in Section 4.2), the Chicago Assets and the Sunbeam Assets (as defined in Sections 1.2 and 1.3) (the Chicago Assets and the Sunbeam Assets are collectively referred to as the "Assets").

**Section 1.2    Chicago Assets.** The term "Chicago Assets" shall mean:

(a)    The fee simple interest in the owned real property described on Schedule 1.2(a) hereto, including all land, improvements, buildings, fixtures and other appurtenances thereto (the "Chicago Real Property") subject, however, to all existing restrictions, reservations, easements, encumbrances, declarations, conditions, covenants,

.

party wall agreements, zoning ordinances, any state of facts an accurate survey may show, and all taxes, levies and assessments imposed by any governmental agency;

(b)      the machinery, equipment, transport racks, trays, back room racks and special display equipment (as determined by the parties) used in the Chicago Business, including any spare or surplus parts related thereto, substantially as listed on Schedule 1.2(b) hereto (the "Chicago Equipment"); provided, however, that notwithstanding Schedule 1.2(b), the Sun Maid raisin production line is specifically excluded from the definition of Chicago Equipment;

(c)      the computers and hand-helds used in the Chicago Business listed on Schedule 1.2(c) (the "Chicago Hardware");

(d)      Seller's rights in the licensed computer software (to the extent assignable) used in the Chicago Business listed on Schedule 1.2(d) (the "Chicago Software"); provided, however, that Purchaser shall be responsible for any and all license fees for use of such Chicago Software after the Closing;

(e)      the perpetual, royalty-free, assignable, transferable exclusive license to use the trademarks as described in Schedule 1.2(e) (the "Trademarks") pursuant to the terms of the License Agreement (as described in Section 3.6), the right to use the Seller's plates in connection with packaging using the Trademarks pursuant to the Terms of the License Agreement and the assignment of plates (to the extent assignable) for private label, Seller's rights, to the extent assignable, on the Sun Maid label and the right to use, during the period ending one (1) year after Closing (as may be extended by mutual consent of the parties), Seller's Universal Product Codes ("UPC") in connection with the Trademarks licensed for use in the Chicago Territory pursuant to the terms of the License Agreement;

(f)(i)    the owned vehicles, including route trucks, tractor-trailers and trailers, listed on Schedule 1.2(f)(i) (the "Chicago Owned Vehicles");

(ii)     all Seller's rights and interest in the leases covering the leased vehicles selected and assumed by Purchaser as described on Schedule 1.2(f)(ii) (the "Chicago Vehicle Leases"); provided, however, that Purchaser shall be responsible for any and all lease payments attributable to the use of such vehicles after the Closing and, provided, further, if such leases are not assignable, Seller shall sublease the vehicles to Purchaser at Seller's cost and shall assign to Purchaser any purchase options or rights for the vehicles related thereto;

(g)      all owned spare parts for vehicles, maintenance, sanitation and garage inventories used in the Chicago Business;

(h)      all owned office equipment, telephone equipment and office inventories used in the Chicago Business;

(i)     all of Seller's rights in all warranties of any manufacturer or vendor with respect to equipment, fixtures, vehicles, office furnishings, instruments, leasehold improvements, spare parts or any other personal property used in the Chicago Business;

(j)     all of Seller's right, title and interest, to the extent assignable or transferable by it, in and to all licenses, certificates of exemption, and other governmental licenses or permits issued to Seller primarily in connection with the operation of the Chicago Business which are no longer required by Seller after Closing;

(k)     all Seller's rights and interest, to the extent assignable and transferable by it, to service private label, fast food and institutional accounts presently being serviced in the Chicago Business;

(l)     subject to Section 1.4 hereof, all packaging, ingredient and thrift store inventories (whether supplied by Seller or outside vendors subject, however, to the valuation procedure set forth in Section 2.2(b) hereof) usable in the Chicago Business in the usual course of the business (the "Chicago Inventory");

(m)     pre-paid rentals under Chicago Assigned Leases and Chicago Assigned Contracts, deposits under Chicago Assigned Leases and Chicago Assigned Contracts, pre-paid utility fees and charges, utility deposits and pre-paid ad valorem or other property taxes related to the Chicago Business, specifically purchased by Purchaser pursuant to Section 2.2(d) (the "Chicago Prepaid Items");

(n)     the non-exclusive right to information regarding the delivery stops in the Chicago Business which are serviced by the Seller as of the Closing including customer lists, records, and correspondence relating thereto (the "Chicago Delivery Routes");

(o)     the fixtures and signage owned by Seller at the branch locations related to the Chicago Business;

(p)     Seller's leasehold interest in the leases selected and assumed by Purchaser relating to the leased branch locations as set forth on Schedule 1.2(p) hereto (the "Chicago Assigned Leases");

(q)     the contracts, personal property leases, agreements, and understandings relating to the Chicago Assets selected and assumed by Purchaser and specifically described on Schedule 1.2(q) hereto (the "Chicago Assigned Contracts"); and

(r)     all labor and employment records relating to the Transferred Employees (as defined in Section 12.1(a)).

**Section 1.3    Sunbeam Assets.** The term "Sunbeam Assets" shall mean:

(a)     the fee simple interest in the owned real property described on Schedule 1.3(a) hereto, including all land, improvements, buildings, fixtures, and other appurtenances thereto (the "Sunbeam Real Property", and with the Chicago Real Property

referred to as the "Real Property") subject. however. to all existing restrictions. reservations. easements, encumbrances. declarations. conditions. covenants. party wall agreements. zoning ordinances. any state of facts an accurate survey may show, and all taxes. levies and assessments imposed by any governmental agency;

(b)   delivery equipment including transport racks, trays. back room racks and special display equipment used in the Sunbeam Business as determined by the parties and as listed on Schedule 1.3(b) (the "Sunbeam Equipment"; and. with the Chicago Equipment, referred to as the "Equipment");

(c)   the hand-helds used in the Sunbeam Business listed on Schedule 1.3(c) (the "Sunbeam Hardware". and with the Chicago Hardware. referred to as the "Hardware");

(d)   Seller's rights in the licensed computer software (to the extent assignable) used in the Sunbeam Business listed on Schedule 1.3(d) (the "Sunbeam Software". and with the Chicago Software. referred to as the "Software"); provided, however, that the Purchaser shall be responsible for any and all license fees for use of such Sunbeam Software after the Closing;

(e)(i)   the owned vehicles. including route trucks and trailers, listed on Schedule 1.3(e) (the "Sunbeam Owned Vehicles". and with the Chicago Owned Vehicles, referred to as the "Owned Vehicles");

(ii)   all Seller's rights and interest in the leases covering the leased vehicles selected and assumed by Purchaser as described in Schedule 1.3(e)(ii) (the "Sunbeam Vehicle Leases"); provided, however, that Purchaser shall be responsible for any and all lease payments attributable to the use of such vehicles after the Closing and provided, further, if such leases are not assignable. Seller shall sublease such vehicles to Purchaser at Seller's cost and shall assign to Purchaser any purchase options or rights for the vehicles related thereto;

(f)   all parts for vehicles, maintenance, sanitation and garage inventories actually located at the Sunbeam Real Property; provided, however, that at those combination depots that distribute both Butternut products and Sunbeam products. such items will be divided equally by the parties;

(g)   all owned office equipment, telephone equipment, and office inventories located at the Sunbeam Real Property and the leased branch locations described in Schedule 1.3(o) hereto:

(h)   all of Seller's rights in all warranties of any manufacturer or vendor with respect to fixtures, vehicles, office furnishings, instruments, leasehold improvements, spare parts or any other personal property used in the Sunbeam Business;

(i)     all of Seller's right, title and interest, to the extent assignable or transferable by it, in and to all licenses, certificates of exemption, and other governmental licenses or permits issued to Seller primarily in connection with the Sunbeam Business which are no longer required by Seller after the Closing:

(j)     all of Seller's rights and interest (to the extent transferable) to the "Roman Meal," "Purity" and "Sunbeam" labels, all as described in the License Agreement, and all of Seller's rights and interest to the extent assignable and transferable by it, to service private label, fast food and institutional accounts presently being serviced in the Sunbeam Business and the right to use, during the period ending one (1) year after the termination of the Post-Closing Transition (as may be extended by the mutual agreement of the parties), Seller's UPC's in connection with the Trademarks licensed for use in the Sunbeam Territory pursuant to the License Agreement;

(k)     subject to Section 1.4 hereof, all packaging and thrift store inventories (whether supplied by Seller or outside vendors subject, however, to the valuation procedures set forth in Section 2.2(b) hereof) usable in the Sunbeam Business in the usual course of the business (the "Sunbeam Inventory", and with the Chicago Inventory, referred to as the "Inventory");

(l)     pre-paid rentals under Sunbeam Assigned Leases and Sunbeam Assigned Contracts, deposits under Sunbeam Assigned Leases and Sunbeam Assigned Contracts, pre-paid utility fees and charges, utility deposits and pre-paid ad valorem or other property taxes related to the Sunbeam Business, specifically purchased by Purchaser pursuant to Section 2.2(d) (the "Sunbeam Prepaid Items", and with the Chicago Prepaid Items, referred to as the "Prepaid Items");

(m)     the non-exclusive right to information regarding the delivery stops in the Sunbeam Business which are serviced by the Seller as of the Closing including customer lists, records, and correspondence relating thereto (the "Sunbeam Delivery Routes", and with the Chicago Delivery Routes, referred to as the "Delivery Routes");

(n)     the fixtures and signage owned by Seller at the branch locations related to the Sunbeam Business;

(o)     the Seller's leasehold interest in leases selected and assumed by Purchaser relating to the leased branch locations related to the Sunbeam Business as set forth on Schedule 1.3(o) hereto (the "Sunbeam Assigned Leases", and with the Chicago Assigned Leases, referred to as the "Assigned Leases"); and

(p)     the contracts, personal property leases, agreements, and understandings relating to the Sunbeam Assets selected and assumed by Purchaser specifically described on Schedule 1.3(p) hereto (the "Sunbeam Assigned Contracts", and with the Chicago Assigned Contracts, referred to as the "Assigned Contracts").

**Section 1.4**    **Thrift Store Inventories.** The value of the Inventory supplied by the Seller at the thrift stores acquired by Purchaser shall not be included within the valuation of the Inventory for purposes of the adjustment of the Purchase Price pursuant to Section 2.2; provided, however, that the Inventory supplied to such thrift stores by outside vendors shall be included within the Purchase Price adjustment. In exchange for Seller not charging Purchaser for the Seller supplied Inventory in the thrift stores acquired by Purchaser, Purchaser shall collect after the Chicago Transfer Date, with respect to the Chicago Business and after Closing with respect to the Sunbeam Business, all stale product delivered prior to the Chicago Transfer Date Closing, as applicable and shall return such stale product to the Purchaser's acquired thrift stores.   Purchaser shall then be responsible for any and all credits due to merchants, grocery stores and other vendees on account of such collected stale product.

**Section 1.5**    **Excluded Assets.** The "Excluded Assets" shall mean any assets not specifically identified above as an Asset, including the items set forth on Schedule 1.5, the Sun Maid raisin production line at the Chicago Bakery, the Southbend and LaPorte, Indiana depots and related assets, the Peoria, Illinois depot on Lincoln Street and related assets, the Jacksonville, Illinois depot, all "Salesman Unauthorized," and all of Seller's cash on hand and accounts receivable related to the Chicago Business and the Sunbeam Business (the "Accounts Receivable"). For a period ending between sixty (60) and ninety (90) days after each of the Chicago Transfer Date (as defined in Section 4.1), with respect to the Chicago Business and the Closing, with respect to the Sunbeam Business (such ending period as determined by Seller), Purchaser shall assist Seller in collecting all Accounts Receivable related to the operation of the Chicago Business during the period prior to the Chicago Transfer Date and the Sunbeam Business during the period prior to Closing and shall remit all cash collected on account thereof to Seller on a bi-weekly basis. Purchaser hereby acknowledges that no sale or transfer of the Accounts Receivable to Purchaser is made or contemplated by this Agreement and that Seller is entitled to receive payment of all of the Accounts Receivable. Seller hereby acknowledges that Purchaser is not guaranteeing the payment of the Accounts Receivable. The parties shall cooperate with each other in connection with the collection of the Accounts Receivable.

## ARTICLE II

## PURCHASE PRICE

**Section 2.1**    **Purchase Price.** The total purchase price for the Assets shall be an amount equal to Twenty Million Dollars ($20,000,000) plus the value of the Inventory, Prepaid Items, and the Plant and Thrift Store Change Fund (as determined in Section 2.2) minus the value of the vacation pay owing on behalf of Transferred Employees and the Pro-rated Items (as determined in Section 2.2) (the "Purchase Price"). The Purchase Price shall be paid by Purchaser to Seller as follows:

(a)    an amount, in federal funds by wire transfer to an account designated by Seller, at Closing of  Seventeen Million Dollars ($17,000,000) (the "Closing Date Payment");

(b)      Three Million Dollars ($3.000.000), in federal funds by wire transfer.
on the fifth (5th) annual anniversary of the Closing Date (the "Deferred Payment").
Purchaser shall have the right to prepay all or part of the balance due. Interest shall accrue
on the outstanding principal amount of the Deferred Payment at a rate of 9.25% per year.
payable quarterly.   The Deferred Payment shall be evidenced by a promissory note by
Purchaser in favor of Seller (the "Note").

**Section 2.2      Post-Chicago Transfer Date and Post-Closing Purchase Price Adjustment.**

(a)      (i) Within 14 days of the end of the Chicago Transfer Date the parties
shall agree on the Inventory Adjustment and Plant and Thrift Store Change
Adjustment with respect to the Chicago Business for the period ending as of the
Chicago Transfer Date and a payment shall be made by Purchaser to Seller on
account of amounts owing as a result of such calculations pursuant to
Section 2.2(a)(ii).

(ii) Within 14 days after the Closing, the parties shall agree on the
Inventory Adjustment (only with respect to the Sunbeam Business), Vacation Pay
Adjustment. Prepaid and Pro-rated Items Adjustment, and Plant and Thrift Store
Change Fund Adjustment (only with respect to the Sunbeam Business), all as defined
in this Section 2.2. The amounts determined as set forth in this Section 2.2 on
account of the foregoing shall be netted against each other and a payment made by
the party owing the other on account of the adjustments by wire transfer within three
(3) days of such final determination.

(b)      Inventory Adjustment. The value of the Inventory (packaging and
ingredients) (as measured by the cost thereof on Seller's books on the Chicago Transfer Date
with respect to the Chicago Business and Closing Date with respect to the Sunbeam Business
determined using generally accepted accounting principles, consistently applied) shall be
determined as set forth herein. The Seller and Purchaser shall conduct a physical count of
the Inventory as of the Chicago Transfer Date or the Closing (or such other date as may be
mutually agreed upon), as applicable. Seller shall inform Purchaser as to the time and
location that such physical count will be conducted so that it may be observed by the
Purchaser or its representative(s). The value of the Inventory shall not include the value of
the product supplied by the Seller to the thrift stores in accordance with Section 1.4 hereof,
but shall include the value of the product supplied by outside vendors. Immediately after the
physical count, Seller shall value the Inventory as set forth above and shall inform the
Purchaser in writing of the value of the Inventory. If the parties do not agree on the count
or value of the Inventory, the parties shall negotiate in good faith to resolve the difference.
The Purchaser shall pay to Seller the value of the Inventory as determined pursuant hereto
(the "Inventory Adjustment"). In the event the parties are unable to agree on such valuation,
they shall jointly select a neutral. third party arbitrator to resolve such valuation issue, whose
decision in the matter shall be final.

(c)     Vacation Pay Adjustment.  With respect to untaken, earned and accrued vacation for Transferred Employees, Seller shall pay to Purchaser, an amount equal to the untaken, earned and accrued vacation pay for such Transferred Employees, arising prior to the Chicago Transfer Date, with respect to the employees hired by Purchaser in the Chicago Business and the Closing Date with respect to the employees hired by Purchaser in the Sunbeam Business which amount shall be determined in accordance with any policy or collective bargaining agreement provisions for such Transferred Employees (the "Vacation Pay Adjustment").  Following such payment, Seller shall have no further liability with respect to such vacation pay to its former employees for services rendered prior to the Chicago Transfer Date or Closing Date, as applicable.  Seller agrees to provide to Purchaser before the Chicago Transfer Date, with respect to the employees related to the Chicago Business and Closing with respect to the employees related to the Sunbeam Business for whom vacation pay has been untaken, earned and accrued and each employee's entitlement to vacation.  If Purchaser determines that there is a discrepancy between the amount paid by Seller on account of untaken, earned and accrued vacation pay and the actual amount of vacation pay that should have been accrued as aforesaid, Purchaser shall notify Seller in writing of the amount of such discrepancy and the parties shall negotiate in good faith to resolve the difference.  In the event the parties are unable to agree on such valuation, they shall jointly select a neutral, third party arbitrator to resolve such valuation issue, whose decision in the matter shall be final.

(d)     Prepaid and Pro-rated Items Adjustment. Purchaser shall pay Seller the value of all pre-paid rentals under Assigned Leases and Assigned Contracts, deposits under Assigned Leases and Assigned Contracts, utility fees and charges, utility deposits and ad valorem or other property taxes and similar items on or related to the Assets which are paid prior to the Closing Date that Purchaser will receive the benefits of after the Closing Date and which are paid prior to the Chicago Transfer Date that Purchaser will receive the benefits of after the Chicago Transfer Date (the "Prepaid Items Adjustment") and the Seller shall pay Purchaser for any items (such as property taxes) that are payable after the Closing Date that relate to periods prior to the Closing Date that Seller has received the benefits of ("Pro-rated Items Adjustment").  If the Prepaid Items exceed the Pro-rated Items, the difference shall be added to the Purchase Price.  If the Pro-rated Items exceed the Prepaid Items, the difference shall be subtracted from the Purchase Price (the "Prepaid and Pro-rated Items Adjustment").

(e)     Plant and Thrift Store Change Fund Adjustment.  Seller shall determine and Seller shall confirm the amount of cash on hand (including cash in cash drawers or petty cash funds) as of the Chicago Transfer Date, with respect to the Chicago Business and as of Closing with respect to the Sunbeam Business, as applicable, at the plant and thrift stores to be acquired by Purchaser pursuant hereto (the "Plant and Thrift Store Change Fund").  The amount of the Plant and Thrift Store Change Fund shall be paid by Purchaser to Seller  (the "Plant and Thrift Store Change Fund Adjustment").

**Section 2.3     Allocation of Purchase Price.** Seller and Purchaser agree that the respective fair market values of the Assets shall be allocated to the Assets in accordance with the allocations set forth in the Allocation Agreement. Seller and Purchaser agree that all tax returns and

reports shall be prepared in a manner consistent with the Allocation Agreement. The Allocation Agreement is intended to comply with Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code") and the regulations thereunder. This Section 2.3 shall not prohibit the parties from preparing their financial statements and documents other than tax returns and reports in a manner inconsistent with the Allocation Agreement.

**Section 2.4      Like-Kind Exchange.** At the option of Seller, Purchaser agrees to cooperate with Seller in closing all or part of this transaction as a like-kind exchange under Section 1031 of the Internal Revenue Code with respect to the property rights to be conveyed by Seller hereunder. Purchaser and Seller agree that Seller may substitute an intermediary ("Intermediary") to act in place of Seller as the seller of the property. Intermediary shall be designated in writing by Seller. Upon identification of Intermediary, Intermediary shall be substituted for Seller as the seller of the property. Purchaser agrees to accept the property and all other required performance from Intermediary and to render its performance of all of its obligations to Intermediary. Purchaser agrees that performance by Intermediary will be treated as performance by Seller, and Seller agrees that Purchaser's performance to Intermediary will be treated as performance to Seller. In the event of the breach of any representations, warranties, obligations and undertakings by Seller or Intermediary (whether the representation, warranty, obligation or undertaking is express or implied), Purchaser's exclusive recourse shall be against Seller; Purchaser shall have no recourse of any type against Intermediary arising from this transaction.

**Section 2.5      Method of Payment.** All payments to be made pursuant to this Agreement shall be made by federal wire transfer of immediately available funds. Seller shall designate an account to receive such funds in writing at least one (1) business day prior to the Closing.

## ARTICLE III

## OTHER AGREEMENTS TO BE DELIVERED

**Section 3.1      The Note.** Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Purchaser shall execute and deliver the Note in favor of Seller substantially in the form set forth as Exhibit B hereto.

**Section 3.2      Supply Agreement.** Upon the terms and subject to the conditions contained in this Agreement, on the Chicago Transfer Date, Seller and Purchaser shall enter into a supply agreement substantially in the form set forth at Exhibit C hereto (the "Supply Agreement").

**Section 3.3      Right of First Refusal.** Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller and Purchaser shall enter into a right of first refusal agreement relating to the baking facility located in Decatur, Illinois, substantially in the form of Exhibit D hereto (the "Right of First Refusal").

**Section 3.4**    **Technical Information and Confidentiality Agreement.** Upon the terms and subject to the conditions contained in this Agreement, on the Chicago Transfer Date, Seller and Purchaser shall enter into a technical information and confidentiality agreement substantially in the form of Exhibit E (the "Technical Information and Confidentiality Agreement").

**Section 3.5**    **Allocation Agreement.** Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller and Purchaser shall enter into an allocation agreement substantially in the form of Exhibit F hereto (the "Allocation Agreement").

**Section 3.6**    **License Agreement.** Upon the terms and subject to the conditions contained in this Agreement, on the Chicago Transfer Date, Seller and Purchaser shall enter into a trademark license agreement substantially in the form of Exhibit G hereto (the "License Agreement").

**Section 3.7**    **Assignment and Assumption Agreements.** Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller and CBC shall enter into assignment and assumption agreements substantially in the form of Exhibits H-1 and H-2 hereto (the "Assignments") with respect to the Assigned Leases and the Assigned Contracts.

**Section 3.8**    **Vehicle Subleases.** Upon the terms and subject to the conditions contained in this Agreement, on the Chicago Transfer Date, Seller and Purchaser shall enter into a vehicle sublease substantially in the form of Exhibit I-1 hereto, relating to the sublease of certain vehicles leased by Seller used in the Chicago Business and at the Closing, Seller and Purchaser shall enter into a vehicle sublease in the form of Exhibit I-2 relating to the sublease of certain vehicles related to the Sunbeam Business (the "Vehicle Subleases").

**Section 3.9**    **Leases.** Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller and Purchaser shall enter into lease agreements substantially in the form of Exhibits J-1 and J-2 hereto (the "Leases"), relating to the lease by Seller to Purchaser of the depots located in Peoria, Illinois on Lincoln Street and in Jacksonville, Illinois.

## ARTICLE IV

## THE CHICAGO TRANSFER DATE AND THE CLOSING

**Section 4.1**    **Chicago Transfer Date.**    The Chicago Business shall be operated and managed by the Purchaser effective at 11:59 p.m. central time on December 28, 1996 (the "Chicago Transfer Date"). Upon the Chicago Transfer Date until the Closing Date, with respect to the Chicago Business as follows:

(a)    Transferred Employees related to the Chicago Business shall be terminated by Seller and hired by Purchaser as of the Chicago Transfer Date.

.

(b)     Title to the Chicago Owned Vehicles shall be transferred to Purchaser effective as of the Chicago Transfer Date, such titles to be held by Seller until the Closing Date, unless earlier released by Seller to Purchaser (upon such Release, title being deemed delivered to and accepted by Purchaser).

(c)     The Chicago Vehicle Leases shall be assigned to Purchaser effective as of the Chicago Transfer Date.

(d)     Seller shall maintain the normal and customary property insurance on the real property related to the Chicago Business and Purchaser shall obtain and maintain normal and customary automobile insurance on all of the Chicago Owned Vehicles and vehicles subject to the Chicago Vehicle Leases (such policies naming Seller as an additional insured) worker's compensation coverage on the Transferred Employees related to the Chicago Business as required by law and general liability insurance covering the Chicago Business (such policies naming the Seller as an additional insured).

(e)     All purchases of packaging and ingredients inventory in the Chicago Business after the Chicago Transfer Date shall be made by Purchaser for its own account either from third parties or from Seller as set forth herein. Purchaser shall be responsible for all costs and expenses of operating the Chicago Business after the Chicago Transfer Date. Seller shall invoice Purchaser weekly for any costs or expenses, including lease payments incurred or paid by Seller related to the Chicago Business during the period from the Chicago Transfer Date to the Closing Date.

(f)     Purchaser shall retain any profits earned or absorb any losses incurred during the period between the Chicago Transition Date and the Closing Date or, if applicable, the date of termination of this Agreement.

(g)     Purchaser agrees to indemnify, hold harmless and defend Seller from and against and will reimburse Seller with respect to, all claims, expenses, fees losses, penalties, judgments at any time and from time to time asserted against or incurred by Seller which relate to Purchaser's operation of the Chicago Business after the Chicago Transfer Date without regard to the provisions of Section 15.6 hereof. This Section 4.2(f) shall survive indefinitely any termination of this Agreement.

**Section 4.2     The Closing.** The delivery of documents related to the transfer of the Assets, shall take place on or about January 19, 1997, with the wire transfer of the Closing Date Payment to take place on such date, beginning at 9:00 a.m. (such date being the "Closing Date" and such time on such date being the "Closing"), Kansas City, Missouri time, at the offices of Shook, Hardy & Bacon L.L.P., One Kansas City Place, 1200 Main Street, Suite 3100, Kansas City, Missouri 64105, or at such other time, date or place as the parties hereto shall mutually agree.

## ARTICLE V

## ASSUMPTION OF CERTAIN LIABILITIES

**Section 5.1    Liabilities Assumed.** In connection with its acquisition of the Assets, Purchaser shall assume  all liabilities relating to the Chicago Business and Sunbeam Business arising out of events occurring on and after the Closing, including those provided for in Article XII, Article XIII and the liabilities set forth on Schedule 5.1 (the "Assumed Liabilities").

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser on the date hereof as follows:

**Section 6.1    Organization.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite corporate power and authority to own the owned Assets and to carry on the Chicago Business and the Sunbeam Business as it is now being conducted.

**Section 6.2    Authorization and Enforceability.**

(a)    Seller has all requisite corporate power and authority to execute, deliver and perform this Agreement and all other instruments and agreements required to be executed, delivered or performed by it pursuant hereto.  As of the date hereof and on the Closing Date, the execution and delivery of this Agreement has been, and the performance of this Agreement and all such other instruments and agreements, will have been duly authorized by all necessary corporate action on the part of Seller.

(b)    This Agreement and the other instruments and agreements executed pursuant hereto constitutes or will constitute the legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c)    The execution, delivery and performance of this Agreement by Seller and the other instruments and agreements required to be executed, delivered or performed by it pursuant hereto will not result in a violation of any laws, judicial or administrative orders, judgments, decrees, consent decrees, conciliations or compliance agreements to which Seller is bound or result in a breach by Seller of any material agreements to which Seller is a party.

**Section 6.3    Qualification as Foreign Corporation.**  Seller is duly qualified and in good standing as a foreign corporation and duly authorized to do business in the States of Illinois, Indiana, Missouri and Wisconsin and in each other jurisdiction where the ownership of properties used in connection with the Chicago Business and the Sunbeam Business so requires.

**Section 6.4    Personal Property.**

(a)    Except as set forth on Schedule 6.4 hereto, Seller has good and marketable title to all owned personal property, tangible or intangible, included in the Assets, free and clear of any pledge, security interest, charge, claim, lien or other encumbrance or claim of any kind, other than liens for taxes not yet due and payable.

(b)    SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY, CONDITION, DESIGN, OPERATION OR FITNESS OF SUCH ASSETS FOR THEIR INTENDED PURPOSE.  Prior to the Closing, Seller shall allow Purchaser, and its agents and representatives, free and full access to all the Assets in order that Purchaser may conduct such tests and inspections as Purchaser deems necessary to determine whether the Assets are in adequate condition and repair for, and fit for, Purchaser's intended use.

**Section 6.5    Title to Real Property.**

(a)    Schedules 1.2(a) and 1.3(a) hereto sets forth an accurate and complete legal description of each tract of the Real Property.  Seller has marketable fee simple title to the Real Property free and clear of any mortgage, deed of trust, security interest, mechanic's or materialmen's lien or any other encumbrance of any kind.

(b)    To the knowledge of Seller, the use and operation of the Business on the Real Property does not violate any material covenant, condition, restriction or easement of record relating to the Real Property, or any material zoning, law, regulation or ordinance affecting the Real Property.

(c)    To the knowledge of Seller, the Real Property is currently zoned in the zoning category which permits operation of the Real Property as now used.

(d)    Except as expressly provided herein, Seller makes no representation or warranty, express or implied, as to the condition of the Real Property and the Real Property is being conveyed AS IS-WHERE IS.

**Section 6.6    Leases.**  To the knowledge of Seller, Seller holds a valid leasehold estate pursuant to each Assigned Lease, and enjoys peaceful and undisturbed possession thereunder. To the knowledge of Seller, all Assigned Leases are valid, binding, and enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and general equity principles, and are in full force and effect.  To the knowledge of Seller, Seller has

complied with all material obligations thereunder as tenant, and there are no existing defaults by any other party thereunder.

### Section 6.7 Environmental Matters.

(a)     For purposes of this Section 6.7, the following terms shall have the following meanings:

(i)     "Environmental Claims" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, of any Environmental Law or Environmental Permit (hereafter "Claims"), including, without limitation, (A) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (B) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Substances or arising from alleged injury or threat of injury to the environment.

(ii)     "Environmental Laws" means any federal, state, or local statute, law, rule, regulation, ordinance or code in effect as of the date hereof, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to human health and the environment or Hazardous Substances, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 et seq.; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 1001 et seq.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 1801 et seq.; The Occupational Safety and Health Act, as amended, 29 U.S.C. § 651 et seq.; or any environmental transfer laws which regulate the transfer of property and the corresponding state laws, regulations and local ordinances, etc. which may be applicable, as any such acts have been or may be amended.

(iii)     "Environmental Permits" means all permits, approvals, identification numbers, licenses and other authorizations required under any applicable Environmental Law.

(iv)     "Hazardous Substances" means (A) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "hazardous air

pollutants," "pollutants." "contaminants." "toxic chemicals." "toxics." "hazardous chemicals," "extremely hazardous substances." "pesticides" or related materials. as presently defined in any applicable Environmental Law; (B) radioactive materials. asbestos-containing material and urea formaldehyde foam insulation; and (C) any other chemical. material or substance. the presence of which requires investigation or remediation under any Environmental Law.

(b)     Seller represents and warrants that with respect to the Real Property except as would not have a material adverse effect on the Real Property: (i) Seller has not violated nor is in violation in any respect of any applicable Environmental Law; (ii) Seller has all Environmental Permits and is in compliance with their requirements; (iii) the Real Property (including, without limitation, soils and surface, ground waters and buildings) is not contaminated with any Hazardous Substances requiring remediation under applicable Environmental Laws; (iv) Seller has not received written notice of any past. pending. or to the knowledge of Seller. threatened Environmental Claims or circumstances that could reasonably be anticipated to form the basis thereof against Seller; (v) the Real Property is not listed on CERCLIS. the NPL. or any similar state or local listing nor is it included in an area included in such a list. and Seller has not received written notice that such a listing is pending or contemplated.

(c)     Seller hereby agrees to cooperate in assigning to Purchaser all Environmental Permits that may be lawfully transferred.

(d)     Seller hereby agrees to remediate within a reasonable time after Closing. at its own cost and expense. those items specifically listed on Schedule 6.7(d). which items were noted or discovered in a Phase I Environmental Assessment on the Real Property. In the event Seller does not rectify or remediate such Hazardous Substances within a reasonable period of time as agreed to by the parties. Purchaser may contract with an independent contractor to remediate the contamination and inform Seller in writing of the cost thereof for reimbursement from Seller. Seller shall have five (5) calendar days after receiving written notice of the cost of remediation from Purchaser to reimburse Purchaser.

**Section 6.8     Litigation.** Except as set forth on Schedule 6.8 hereto, there are no actions, suits, condemnation actions, claims, administrative, arbitral or other proceedings or governmental investigations ("Litigation") that are pending or, to the knowledge of Seller. threatened against or otherwise affecting the Chicago Business or the Sunbeam Business or any of the Assets before any arbitrator or arbitration panel or any court or other federal, state or other governmental department, commission, board, agency or instrumentality.

**Section 6.9     Compliance with Laws.**

(a)     Seller has complied in all material respects with all material laws. rules, regulations, ordinances, orders, judgments, or decrees applicable to the Assets.

(b)     Neither the execution. delivery or performance by Seller of this Agreement and the other agreements to be entered into by it in connection with the transactions contemplated hereby. nor the transfer to Purchaser of the Assets or the

assumption by Purchaser of the Assumed Liabilities, will in any material respect violate any provision of any material applicable law or violate, conflict with, or result in a breach of any provision of, or constitute a default under any material provision of any mortgage, lien, lease agreement, contract, instrument, order, arbitration award, judgment, decision or any other agreement to which Seller is a party or by which it is otherwise bound or to which any of the Assets or the liabilities being assumed by Purchaser hereunder are subject, subject, however, to the need to obtain landlord's consent to the transfer and assignment of the Assigned Leases.

### Section 6.10   Assigned Contracts.

(a)   Seller will make available for inspection by Purchaser complete and correct copies of the Assigned Contracts, together with all exhibits, schedules and amendments thereto.

(b)   The Assigned Contracts are valid, binding and enforceable in accordance with their terms subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and general equity principles, are in full force and effect with, to the knowledge of Seller, no default or dispute or basis therefor existing with respect thereto, and will remain in full force and effect during the term thereof (except as a result of any acts or omissions by Purchaser), are assignable to Purchaser and, except as contemplated by this Agreement, will not be terminated or otherwise affected by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

### Section 6.11   Trademarks.

(a)   Schedule 1.2(e) is a complete and correct description of the nature of Seller's right, title or interest in the trademarks to be licensed to Purchaser for use in connection with the Chicago Business and the Sunbeam Business pursuant to the terms of the License Agreement and the products or product lines with respect to which each is used. The Trademarks are in all respects valid and in full force and effect.

(b)   No proceeding involving the validity, infringement, or Seller's rights to the Trademarks or any registrations or recordings thereof or applications therefor, are pending or, to the knowledge of Seller, threatened. Seller has not received any notice, demand or claim that any Trademark infringes the trademark or other rights of any third party, and to the knowledge of Seller, there is no basis for any third party making such a demand or claim.

### Section 6.12   Labor Unions.   Schedule 6.12 is a complete list of the labor unions governing employees in the Chicago Business and the Sunbeam Business. Except as set forth on Schedule 6.12 hereto, to the knowledge of Seller, with respect to the Chicago Business and the Sunbeam Business and the Transferred Employees, (a) there are no material labor difficulties, grievances, arbitration proceedings or claims of unfair labor practices presently filed or threatened or (b) organizing campaigns or representation election.

**Section 6.13   Payment of Taxes.**

(a)    For purposes of this Section 6.13, the following terms shall have the meanings set forth below:

(i)    "Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, arising out of or related to the Assets.

(ii)    "Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(b)    The Seller has filed all Tax Returns that it was required to file related to the Chicago Business and the Sunbeam Business and has paid all Taxes shown thereon as owing.

(c)    The representations and warranties set forth in Section 6.13 are not applicable to the extent that the Assets cannot be made subject to tax liens and Purchaser cannot be made liable for Taxes relating to the matters constituting breaches of such representations and warranties.

**Section 6.14   No Finder's or Broker's Fee.**   Seller has not incurred or caused to be incurred any liability for any fee or commission in the nature of a finder's, originator's or broker's fee in connection with the transactions contemplated hereby, for which Purchaser will have any liability.

**Section 6.15   Multiemployer Plans.**   Seller is responsible for and has made all contributions it is required to make to any multiemployer pension, health and welfare or other plan as defined in Section 3(37) of ERISA, related to the Transferred Employees. Seller is responsible for all audits and the costs thereof and shall pay to the pension or plan any contributions or assessments found to be owing prior to the Closing.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

**Section 7.1**     **Organization.**  CBC is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. LBB is a corporation duly organized, validly existing and in good standing under the laws of the State of Missouri. CBC and LBB have all requisite corporate power and authority to own and lease all of its properties and assets and to carry on its business as it is now being conducted.

**Section 7.2**     **Authorization and Enforceability; No Violations.**

(a)     Purchaser has all requisite corporate power and authority to execute, deliver and perform this Agreement and all other instruments and agreements required to be executed, delivered or performed by it pursuant hereto.  As of the date hereof and on the Closing Date, the execution and delivery of this Agreement has been and the performance of this Agreement and all such other instruments and agreements, will have been duly authorized by all necessary corporate action on the part of Purchaser.

(b)     This Agreement and the other instruments and agreements executed pursuant hereto constitutes or will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c)     The execution, delivery and performance of this Agreement by Purchaser and the other instruments and agreements required to be executed, delivered or performed by it pursuant hereto will not result in a violation of any laws, judicial or administrative orders, judgments, decrees, consent decrees, conciliation or compliance agreements to which Purchaser is bound or result in, or a breach of any material agreements by Purchaser to which Purchaser is a party.

**Section 7.3**     **Qualification as Foreign Corporation.**  Purchaser is duly qualified and in good standing as a foreign corporation and duly authorized to do business in the States of Illinois, Indiana, Missouri and Wisconsin and in each other jurisdiction where the ownership of properties used in connection with the Chicago Business and the Sunbeam Business will so require.

**Section 7.4**     **Financial Statements.**  Purchaser has previously delivered to Bear Stearns at the behest of Seller, audited statements of income, stockholders' equity and cash flows for the periods ended December 31, 1994 and 1995 and unaudited statements of income, stockholders' equity and cash flows for the interim period ended October 5, 1996 (the "Income Statements") and audited balance sheets dated as of December 31, 1994 and 1995 and an unaudited balance sheet dated as of October 5, 1996 (the "Balance Sheets") (the Income Statements and Balance Sheets are referred to as the "Financial Statements").  The Financial Statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis. The Balance Sheets are correct and complete and fairly present the financial position and assets and liabilities (whether absolute, accrued or contingent) of Purchaser as of the respective dates thereof. The Income Statements are correct and complete and fairly present the results of operations and financial position of Purchaser for the periods indicated.  Bear Stearns has executed a Confidentiality

0251591.02                              18

Agreement with LBB. Seller shall not have any access to or right to view the Financial Statements without the express written consent of LBB.

**Section 7.5    Financing.** Purchaser has all funds or appropriate commitments from responsible financial institutions (the "Financing Commitment") to provide funds to Purchaser sufficient to satisfy the obligations of Purchaser to purchase the Assets pursuant to the terms hereof. Purchaser has provided Seller with complete copies of all letters, contracts and other documents relating to the Financial Commitment. Purchaser has paid all commitment fees required pursuant to the terms of the Financing Commitment.

**Section 7.6    No Finder's or Broker's Fee.** Purchaser has not incurred or caused to be incurred any liability for any fee or commission in the nature of a finder's, originator's or broker's fee in connection with the transactions contemplated hereby for which Seller will have any liability.

## ARTICLE VIII

## COVENANTS OF SELLER

**Section 8.1    Management of the Assets and Conduct of the Sunbeam Business Pending the Closing.** Seller hereby covenants and agrees that unless otherwise agreed to by Seller and Purchaser during the period of time commencing on the date of this Agreement and ending immediately prior to the Closing or the termination hereof (the "Interim Period"):

(a)    Seller will carry on the Sunbeam Business diligently and substantially in the same manner as heretofore conducted and shall not institute any unusual or novel methods of purchase, sale, lease, management, accounting or operation with respect thereto;

(b)    except as provided in the Assumed Collective Bargaining Agreements (as defined in Section 12.1(c)), Seller will not increase the rates of pay of its employees or increase the fixed compensation payable or to become payable to any employee or change any plan or other contract or commitment in a manner which would increase the benefits or compensation of any such employee, or establish any new plan or other contract or commitment for the benefit of Transferred Employees, and Seller shall not pay any bonus or commission to any Transferred Employee, except for commissions paid in the ordinary course of its business;

(c)    Seller will not enter into any contract or commitment or engage in any transaction relating to the Sunbeam Business or the Assets which is not in the usual and ordinary course of business and consistent with past practices; and

(d)    all tangible, personal property constituting the Assets will be used, operated, maintained and repaired in a manner consistent with past practice.

0251591.02                                    19

**Section 8.2**     **Management of the Assets and Conduct of the Chicago Business After the Chicago Transfer Date and Prior to Closing.**  Purchaser shall manage and operate the Chicago Business after the date hereof until Closing for its own account pursuant to Sections 4.1 and 8.2 hereof.  During the period from the Chicago Transfer Date until Closing, Purchaser covenants and agrees that it will comply with Sections 8.1(a)-(d) above as it relates to its operation of the Chicago Business.  All amounts earned or losses incurred by the Chicago Business prior to the Closing shall be for the benefit of or absorbed by Purchaser.

**Section 8.3**     **Third Party Offers.**  Seller agrees that it will not offer the Assets to any third party nor entertain any offers from third parties during the Interim Period.

**Section 8.4**     **Access to Information and Facilities.**

(a)     Seller shall provide route accounting data to Purchaser (in the format currently used by Seller) within ten (10) calendar days, or as soon thereafter as possible, following the execution of this Agreement.

(b)     Upon the reasonable request of Purchaser, and with the prior written consent of Seller, which consent will not be unreasonably withheld, Purchaser and its representatives will have access during normal business hours prior to the Closing Date to all of the facilities, properties, books and records (including employment records), contracts, and commitments relating to the Assets, as well as the existing officers and employees of Seller whose duties relate to the operation of the Assets.  Seller will furnish Purchaser and its representatives with any and all information concerning the Assets which Purchaser or its representatives reasonably request.

## ARTICLE IX

## CONDITIONS TO OBLIGATIONS OF PURCHASER TO CLOSE

The obligations of Purchaser to consummate the transactions contemplated hereby shall be subject to the fulfillment by Seller, to the reasonable satisfaction of Purchaser, prior to the Closing, of each of the following conditions precedent; provided, however, that any of such conditions may be waived by Purchaser at or prior to the Closing.

**Section 9.1**     **Representations and Warranties True and Correct.**  The representations and warranties of Seller set forth in Article VI hereof shall be true and correct in all material respects when made and as of the Closing Date with the same effect as though made on and as of such date.

**Section 9.2**     **Performance.**  Seller shall have performed and complied in all material respects with all agreements, covenants and conditions contained herein required to be performed or complied with by it on or prior to the Closing Date, shall have executed and delivered such documents and other agreements required hereby.

**Section 9.3**   **Consents.**  Seller shall have obtained and delivered to Purchaser all material consents, approvals, agreements and waivers of any person or entity (including all necessary clearances under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR")) the absence of which would prevent or delay Seller in consummating the transactions contemplated hereby of any substantial part of the Chicago Business or the Sunbeam Business or the use, in any material way, of any Assets. Specifically, the Roman Meal Company shall have consented to the assignment of the Roman Meal franchise from Seller to Purchaser in areas where Purchaser is obtaining the right to sell products under the Roman Meal label. Quality Bakers of America shall have consented to the assignment of the Sunbeam and, to the extent licensed to Seller, the Batter Whipped franchise, from Seller to Purchaser in areas where Purchaser is obtaining the right to sell products under the Sunbeam, and if applicable, Batter Whipped, labels. Purchaser shall have also received consent to the assignment of the Sun Maid franchise from Seller to Purchaser in areas where Purchaser is obtaining the right to sell products under the Sun Maid label.

**Section 9.4**   **Title Insurance and Survey.**  Seller shall have obtained (at Seller's sole expense) a 1992 ALTA owner's title insurance policy insuring good and marketable fee simple title in Purchaser in the Real Property as of the Closing Date naming Purchaser as the insured with coverage in an amount not less than the amount allocated to the Real Property in the Allocation Agreement (respectively), and containing only those title insurance policy exceptions that do not have a material adverse effect on the Real Property (respectively). In addition, Purchaser shall have obtained (at Purchaser's sole cost and expense) a satisfactory ALTA/ACSM survey of the Chicago Bakery Property. Purchaser shall pay all escrow and closing fees associated with the transfer of the Real Property.

**Section 9.5**   **Environmental Assessment.**  Seller shall have provided to Purchaser, at Seller's sole expense, a Phase I Environmental Study on the Real Property, and the environmental conditions disclosed thereon shall not have a material adverse effect on the Real Property, taken as a whole.

**Section 9.6**   **No Litigation.**  There shall be no Litigation, pending or threatened, which is reasonably likely to result in any material adverse change in the Assets or which questions the validity of this Agreement or of any of the agreements, consents, approvals or other instruments referred to herein, or of any action taken or to be taken in connection herewith or which would prevent or hinder the consummation of any of the transactions contemplated hereby.

## ARTICLE X

## CONDITIONS TO OBLIGATIONS OF SELLER TO CLOSE

The obligations of Seller to consummate the transactions contemplated hereby shall be subject to the fulfillment by Purchaser, to the reasonable satisfaction of Seller, prior to the Closing, each of the following conditions precedent; provided, however, that any of such conditions may be waived by Seller at or prior to the Closing.

**Section 10.1** <u>**Representations and Warranties True and Correct**</u>. The representations and warranties of Purchaser set forth in Article VII hereof shall be true and correct in all material respects when made and as of the Closing Date with the same effect as though made on and as of such date.

**Section 10.2** <u>**Performance**</u>. Purchaser shall have performed and complied in all material respects with all agreements, covenants and conditions contained herein required to be performed or complied with by it on or prior to the Closing Date, and shall have executed and delivered such documents and other agreements required hereby.

**Section 10.3** <u>**Consents**</u>. Purchaser shall have obtained and delivered to Seller all consents, approvals, agreements and waivers of any person or entity required of it to consummate the terms hereof.

**Section 10.4** <u>**No Litigation**</u>. There shall be no pending or threatened Litigation which is reasonably likely to result in any material adverse change in the Assets or which questions the validity of this Agreement or of any of the agreements, consents, approvals or other instruments referred to herein, or of any action taken or to be taken in connection herewith or which would prevent or hinder the consummation of any of the transactions contemplated hereby.

## ARTICLE XI

### <u>DELIVERIES TO BE MADE ON THE CHICAGO</u><br><u>TRANSFER DATE AND AT THE CLOSING</u>

**Section 11.1** <u>**Condition Precedent**</u>. Each party's obligation to consummate the transactions contemplated in this Agreement is conditioned on the delivery to such party by the other of the items listed in this Article XI, unless such delivery is expressly waived by such party in writing.

**Section 11.2** <u>**Deliveries by Seller**</u>. Seller shall deliver the following to Purchaser on the Chicago Transfer Date or the Closing Date as indicated below:

(a) a Certificate of Good Standing of Seller issued by the Secretary of State of the States of Delaware, Illinois, Indiana and Wisconsin as of a date not more than 10 business days prior to the Closing Date (Closing Date);

(b) a certified copy of Seller's Bylaws (Closing Date);

(c) bills of sale, and other instruments in form reasonably acceptable to Purchaser as may be necessary or reasonably requested by Purchaser in order effectively to convey, transfer and assign good and marketable title to the Assets (Closing Date);

(d) special warranty deeds conveying the Real Property (Closing Date);

(e)     an ALTA owner's title policy covering the Real Property (Closing
Date);

(f)     UCC search results on the Assets and UCC-3 termination or release
statements related thereto (Closing Date);

(g)     consents of the lessors of the Assigned Leases (except where the
failure to obtain such consents would not have a material adverse effect on either the Chicago
Business or Sunbeam Business) (Closing Date);

(h)     consents of third parties to the assignment of the Assigned Contracts
(except where the failure to obtain such consents would not have a material adverse effect
on either the Chicago Business or Sunbeam Business) (Closing Date);

(i)     an executed copy of the Supply Agreement (Chicago Transfer Date);

(j)     an executed copy of the Right of First Refusal (Closing Date);

(k)     an executed copy of an Allocation Agreement (Closing Date);

(l)     an executed copy of a Technical Information and Confidentiality
Agreement Assets (Chicago Transfer Date);

(m)     an executed copy of the License Agreement (Chicago Transfer Date);

(n)     an executed copy of the Assignment related to the Assigned Leases
(Closing Date);

(o)     an executed copy of the Assignment related to the Assigned Contracts
and Assumed Collective Bargaining Agreements (Chicago Transfer Date and Closing Date);

(p)     an executed FIRPTA affidavit (Closing Date);

(q)     an executed copy of the Vehicle Sublease (Chicago Transfer Date and
Closing Date);

(r)     an executed copy of the Leases (Closing Date); and

(s)     an executed letter agreement concerning the continued use for no more
than 120 days of office space at 131 Waukesha Sunset, Waukesha, Wisconsin (Closing Date)
and any other necessary side letters or agreements.

**Section 11.3   Documents to be Delivered by Purchaser.** Purchaser shall deliver
the following funds and documents to Seller on the Closing Date:

(a)     the Closing Date Payment (Closing Date);

(b)    an executed copy of the Note (Closing Date);

(c)    a Certificate of Good Standing of LBB issued by the Secretary of State of the States of Missouri and of CBC issued by the State of Illinois, as of a date not more than 10 business days prior to the Closing Date (Closing Date);

(d)    a certified copy of Purchaser's Bylaws (Closing Date);

(e)    a counterpart to the Supply Agreement (Chicago Transfer Date);

(f)    a counterpart to the Right of First Refusal (Closing Date);

(g)    a counterpart to the Allocation Agreement (Closing Date);

(h)    a counterpart to the Technical Information and Confidentiality Agreement (Chicago Transfer Date);

(i)    a counterpart to the License Agreement (Chicago Transfer Date);

(j)    a counterpart to the Assignment related to the Assigned Leases (Closing Date);

(k)    a counterpart to the Assignment related to the Assigned Contracts and Assumed Collective Bargaining Agreements (Chicago Transfer Date and Closing Date);

(l)    a counterpart to the Vehicle Sublease (Chicago Transfer Date and Closing Date);

(m)    a counterpart to the Leases (Closing Date); and

(n)    any necessary side letters or agreements (as needed).

## ARTICLE XII

## EMPLOYEES

### Section 12.1    Employees.

(a)    Purchaser shall notify Seller as soon as practicable prior to the Chicago Transfer Date of the employees related to the Chicago Business and prior to Closing of the employees related to the Sunbeam Business, not covered by a collective bargaining agreement, it desires to hire and Purchaser shall be deemed to have hired all employees covered by Assumed Collective Bargaining Agreements (as defined below) such union and non-union employees hired and deemed hired by Purchaser being referred to as the "Transferred Employees". The Transferred Employees shall be terminated by Seller and become employees of Purchaser on the Chicago Transfer Date, with respect to the

Transferred Employees related to the Chicago Business and on the Closing Date with respect to the Transferred Employees related to the Sunbeam Business. The terms and conditions of employment of the non-union Transferred Employees may be set by Purchaser: provided. however, that Purchaser shall comply with the provisions of Article XIII and provided further that Purchaser shall honor each such employee's seniority and years of service for benefit and job bidding purposes (including vacation entitlement). Except as otherwise set forth herein. Purchaser shall have no responsibility for past service for such persons.

(b)     Seller shall be responsible for any and all severance payments and benefits due to its Employees who are not Transferred Employees and for any severance payments calculated pursuant to Seller's severance policy for any non-union Transferred Employees who are severed by Purchaser within 120 days after the Chicago Transfer Date with respect to the Chicago Business and 120 days after the Closing with respect to the Sunbeam Business. Purchaser shall be responsible for any and all other obligations such as COBRA and benefits to the Transferred Employees.

(c)     Purchaser shall assume the collective bargaining agreements with the Bakery. Confectionery and Tobacco Workers' locals. the Teamsters locals. and the Machinists locals as listed on Schedule 12.1(c) (the "Assumed Collective Bargaining Agreements") and set forth in their entirety on Schedule 6.12.

(d)     Purchaser shall assume any obligations related to, the independent distributors on contract to deliver Seller products  pursuant to the Chicago Business and Sunbeam Business ("Independent Distributors").

**Section 12.2   Claims.**  Seller shall administer and retain liability, if any, for all employment and labor related claims of any kind. including but not limited to any claims for severance pay. that arise out of or that are attributable to events occurring prior to the Chicago Transfer Date, with respect to the Chicago Business and the Closing with respect to the Sunbeam Business and for non-union Transferred Employees severed within 120 days after the Chicago Transfer Date and the Closing, as applicable. and Purchaser shall administer and assume liability for all other claims of any kind that arise out of or that are attributable to events occurring on or after the Chicago Transfer Date and the Closing. as applicable; provided, however, that workers' compensation claims shall accrue and liability shall be assigned based on the date the event giving rise to such claims occur.

**Section 12.3   Future Employment.**  Nothing in this Agreement shall be deemed or construed to require Purchaser to continue to employ any of the Transferred Employees for any period after the Chicago Transfer Date, with respect to the Chicago Business and the Closing. with respect to the Sunbeam Business.

**Section 12.4   Employment Records.**  Seller agrees to provide Purchaser all labor and employment records, including but not limited to all labor contract negotiation history and labor contract administration records, payroll, personnel, medical (including audiometric testing records), immigration (including I-9s) and Department of Transportation Records for the Transferred Employees.  Seller shall have access to the employment records of its former employees at all

reasonable times for a period of five years following the Closing for the purpose of defending against any claims brought against it by or on behalf of any former employee.

## ARTICLE XIII

## EMPLOYEE BENEFITS

Section 13.1   Assumption of Seller's Plans.   It is expressly understood and agreed to by the parties that, except as provided in Section 13.2 below and obligations of Purchaser pursuant to Section 12.1(b). Purchaser is not adopting any pension. bonus, profit sharing, stock option, stock incentive, savings, or other employee benefit plans of any kind maintained by Seller, or to which Seller contributes or is required to contribute, for the benefit of the Transferred Employees (the "Seller's Plans") and that Purchaser, as a result of this transaction, shall not assume any liability or obligation arising under any of Seller's Plans. Any liability or obligation relating to or arising under any of Seller's Plans shall remain the sole and complete responsibility of Seller.

Section 13.2   Collectively Bargained Transferred Employees.

(a)   With respect to each Transferred Employee who is covered by an Assumed Collective Bargaining Agreement, Purchaser shall, effective as of the Chicago Transfer Date, with respect to the Chicago Business and the Closing with respect to the Sunbeam Business (subject to Section 13.4), provide such Transferred Employee (and his or her dependents. beneficiaries or any joint annuitant, as the case may be) with all pension. retirement. health. disability. severance and other benefits as are required pursuant to the terms of such Assumed Collective Bargaining Agreement and such Transferred Employee shall receive credit for his or her service with the Seller (including service with any predecessor company) for all benefit purposes. The obligations assumed by Purchaser pursuant to this Section 13.2 shall include, but not be limited to, the obligation to contribute to any "Multiemployer Plan" (as such term is defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) and the continuation of coverage obligations arising under the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended ("COBRA") with respect to those collectively bargained Transferred Employees (or their dependents) who have elected such continuation coverage under any of Seller's group health plans as of the Closing. For purposes of this Section 13.2, a Transferred Employee shall include an individual who (i) is employed by Seller on the Chicago Transfer Date, with respect to the Chicago Business and the Closing with respect to the Sunbeam Business, or (ii) was employed by Seller immediately prior to his or her retirement or other termination of employment prior to the Chicago Transfer Date, with respect to the Chicago Business and the Closing with respect to the Sunbeam Business, or (iii) is, as of the Chicago Transfer Date, with respect to the Chicago Business and the Closing with respect to the Sunbeam Business, on any approved leave of absence from employment with Seller, including, but not limited to, leave due to disability.

(b)     With respect to each Multiemployer Plan that covers a Transferred Employee. Purchaser and Seller agree as follows. in accordance with the provisions of Section 4204 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"):

(i)     Purchaser hereby assumes. effective as of the Chicago Transfer Date. with respect to the Chicago Business and the Closing Date with respect to the Sunbeam Business. Seller's obligation to contribute to each such Multiemployer Plan for the Transferred Employees;

(ii)     Purchaser shall provide to each such Multiemployer Plan the bond or escrow amount described in Section 4204(a)(1)(B) of ERISA. unless the bond or escrow amount is waived by the Pension Benefit Guaranty Corporation ("PBGC"); and

(iii)     The parties agree that. unless the PBGC waives the requirements of Section 4204(a)(1)(C) of ERISA. if Purchaser withdraws from any such Multiemployer Plan in a withdrawal described in Section 4204(a)(1)(C) of ERISA and does not pay its liability to the plan on account of such withdrawal. Seller shall be secondarily liable to the plan for any withdrawal liability it would have had to such plan with respect to the Transferred Employees in the absence of Section 4204(a) of ERISA. Notwithstanding the provisions of the preceding sentence and Section 4204 of ERISA. it is hereby expressly agreed that if Seller incurs any secondary withdrawal liability under the preceding sentence, Purchaser shall indemnify Seller and hold it harmless from and against any loss. damage. cost. liability or expense. including (without limitation) any costs and expenses of litigation and reasonable attorneys' fees. incurred by Seller by reason of such secondary liability.

(iv)     As soon as is practicable after the Closing Date, Purchaser and Seller shall request from the PBGC an exemption from the requirements of Sections 4204(a)(1)(B) and 4204(a)(1)(C) of ERISA.

(v)     For purposes of this Section 13.2(b), the term "Multiemployer Plan" means a multiemployer plan. as defined in Section 3(37) of ERISA, that covers Transferred Employees.

**Section 13.3    Non-Collectively Bargained Transferred Employees.** With respect to those Transferred Employees who are not covered by any of the Assumed Collective Bargaining Agreements, such Transferred Employees (and their spouses, dependents and beneficiaries) shall, effective as of the Chicago Transfer Date, with respect to the Chicago Business and the Closing, with respect to the Sunbeam Business (subject to Section 13.4), become participants in the employee benefit plans and programs available to Purchaser's non-collectively bargained employees (and their spouses, dependents and beneficiaries) upon terms and conditions which are no less favorable than those afforded Purchaser's non-collectively bargained employees. Such Transferred Employees shall receive credit for their service with Seller (including service with any predecessor company)

for purposes of determining their eligibility to participate and eligibility for benefits under such employee benefit plans and programs of Purchaser.

**Section 13.4    Welfare Benefit Obligations.** All Transferred Employees (including all Transferred Employees under Section 13.2) shall continue participating in Seller's "Welfare Plans" (as such term is defined in ERISA Section 3(1)) for 120 days after the Chicago Transfer Date, with respect to the Chicago Business and for 120 days after Closing, with respect to the Sunbeam Business, with the costs thereof being charged by Seller to Purchaser. Purchaser agrees to promptly pay all such costs without offset upon being charged therefore by Seller. At the end of each such 120 day period, the Transferred Employees shall begin participating in Purchaser's Welfare Plans in accordance with Section 13.2 or Section 13.3, as the case may be. Seller's Welfare Plans shall be responsible for claims incurred under such plans prior to the Chicago Transfer Date, with respect to the Chicago Business, and Closing, with respect to the Sunbeam Business, while claims incurred by the Transferred Employees after the Chicago Transfer Date or Closing, as applicable, shall be the responsibility of Purchaser's Welfare Plans. For purposes of this Section 13.4, a claim for health or dental benefits is incurred when the Transferred Employee is provided with health or dental care. Furthermore, for purposes of this Section 13.4, the obligation to provide disability benefits to a Transferred Employee who is covered by an Assumed Collective Bargaining Agreement shall be assumed by the Purchaser regardless of whether such Transferred Employee's disability arose prior to the Chicago Transfer Date, with respect to the Chicago Business, or Closing, with respect to the Sunbeam Business.

**Section 13.5    COBRA Obligations.** Purchaser acknowledges and agrees that Purchaser is a successor employer with respect to the Transferred Employees for purposes of COBRA, that the Transferred Employees will not, as a result of the transaction contemplated by this Agreement, be deemed to have terminated employment with Seller for purposes of COBRA and that any COBRA notices and coverages required to be given or made available to any Transferred Employee shall be given or made by Purchaser and not Seller.

**Section 13.6    Health and Dental Plan Provisions.** For purposes of the Purchaser's obligations set forth in this Article XIII, all Transferred Employees shall be entitled to participate in Purchaser's health and dental care plans without regard to any applicable waiting periods and without regard to any limitations on pre-existing conditions. Furthermore, for purposes of satisfying the applicable deductibles and maximum out-of-pocket limits under Purchaser's health and dental care plans, the Transferred Employees shall receive credit for payments made during calendar 1996 under Seller's health and dental care plans.

## ARTICLE XIV

## BULK TRANSFER; TAX CERTIFICATES

**Section 14.1    Bulk Transfer.** The parties hereto agree and acknowledge that, notwithstanding anything to the contrary contained herein, Seller shall not be required to comply with Article 6-Bulk Transfers of the Uniform Commercial Code, or any similar state or local law, with respect to the transactions contemplated by this Agreement.

**Section 14.2 Effect of Termination.** Seller shall not be required to obtain clearance certificates from any governmental authority with respect to any Tax or with respect to any unemployment compensation insurance contributions.

## ARTICLE XV

### INDEMNIFICATION

**Section 15.1 Survival.** Except for the representations, warranties and covenants made in Section 6.7 concerning Environmental Matters, the representations, warranties, and covenants made herein shall survive the Closing of the transactions contemplated hereby until the third (3rd) annual anniversary of the Closing Date. The representations, warranties and covenants made in Section 6.7 concerning Environmental Matters shall survive until the fifth (5th) annual anniversary of the Closing Date.

**Section 15.2 Indemnification of Purchaser by Seller.** Seller agrees to hold harmless, indemnify and defend Purchaser, from and against, and will reimburse Purchaser with respect to, any and all claims including reasonable attorneys' fees (collectively, "Claims") at any time and from time to time asserted against or incurred by Purchaser insofar as such Claims are based upon:

(a) any material breach or nonfulfillment of or any material inaccuracy in any representation, warranty or covenant contained herein or otherwise made in writing by or on behalf of Seller in connection with the transactions contemplated hereby;

(b) any injury to any person occurring prior to the Chicago Transfer Date, with respect to the Chicago Business and prior to the Closing with respect to the Sunbeam Business, related in any way to any machinery or equipment used in connection with the Chicago Business or the Sunbeam Business, respectively, or to any product of the Chicago Business or the Sunbeam Business, respectively, produced prior to the Chicago Transfer Date or the Closing, as applicable;

(c) any claim for severance or termination pay pursuant to any collective bargaining agreements or otherwise as a result of the transfer of the Chicago Business or the Sunbeam Business (other than claims of Transferred Employees);

(d) any claim related to the Excluded Assets;

(e) any claim based on Article XIV; or

(f) any claim for severance or termination pay, pension or other termination obligations (other than COBRA) for non-union Transferred Employees severed by Purchaser within 120 days after the Chicago Transfer Date, with respect to the Chicago Business and 120 days after the Closing Date with respect to the Sunbeam Business as set forth in Section 12.1(b).

0251591.02                                                29

**Section 15.3   Indemnification of Seller by Purchaser.**  Purchaser agrees to hold harmless, indemnify and defend Seller from and against, and will reimburse Seller with respect to Claims at any time and from time to time asserted against or incurred by Seller insofar as such Claims are based upon:

      (a)     any breach or nonfulfillment of or any inaccuracy in any representation, warranty or covenant contained herein or otherwise made in writing by or on behalf of Purchaser in connection with the transactions contemplated hereby;

      (b)     any and all claims against Seller to the extent such Claims arise from or based upon any action, event or condition occurring after the Chicago Transfer Date, with respect to the Chicago Business and after the Closing with respect to the Sunbeam Business;

      (c)     any injury to any person occurring after the Chicago Transfer Date related to in any way to any machinery or equipment used in the Chicago Business which is the direct result of gross negligence of Purchaser or as the result of any product of the Chicago Business produced which is the result of gross negligence of Purchaser;

      (d)     costs and expenses of surveyors, engineers, architects and other implementing inspections on behalf of Purchaser and for personal injuries to and property damage caused by Purchaser, its employees, agents or independent contractors during such inspections.

      (e)     any claim arising out of or relating to the employment or termination of employment of any Transferred Employee by Purchaser after the Chicago Transfer Date, with respect to the Chicago Business and after the Closing with respect to the Sunbeam Business;

      (f)     all liabilities and claims arising out of, or related to, the coverage (or failure to cover) for a Transferred Employee under any employee benefit plan or program of Purchaser;

      (g)     all liabilities arising under Section 13.2(b)(iii); and

      (h)     the Assumed Liabilities.

**Section 15.4   Indemnification Procedure.**  In the event of any Claim by either party hereto seeking indemnification under this Article XV (an "Indemnified Party"):

      (a)     The Indemnified Party will give the party from whom indemnification is sought (the "Indemnifying Party") prompt written notice of the Claim asserted against or imposed upon or incurred by the Indemnified Party (which notice shall set forth the basis of the Claim). With respect to third party Claims, the Indemnifying Party shall have the right to undertake the defense thereof by representatives of its own choosing provided, that the Indemnifying Party diligently conducts the defense of such Claim; provided, however, that the Indemnified Party may join in the defense of any such Claim and employ counsel at its own expense.

(b)     In the event that the Indemnifying Party, within ten (10) calendar days after notice of a third party Claim, fails or refuses to undertake the defense of such Claim, the Indemnified Party will (upon further written notice to the Indemnifying Party) have the right to undertake the defense, compromise or settlement of the Claim on behalf of and for the account and risk of the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of the Claim at any time prior to the settlement, compromise or final determination thereof. If any Indemnified Party undertakes the defense, compromise or settlement of any such Claim pursuant to this Section 15.4, the Indemnifying Party shall reimburse such Indemnified Party for any reasonable legal fees and expenses incurred in connection therewith within five (5) business days of receipt of notice seeking such reimbursement.

**Section 15.5   Effect of Insurance Payments.** Notwithstanding the provisions of this Article XV, no person shall be entitled to be indemnified hereunder for any portion of the amount of any Claim with respect to which such person has previously received or will receive payment from any insurer.

### Section 15.6   Limitations on Indemnification.

(a)     No Indemnifying Party shall be liable to an Indemnified Party pursuant to Sections 15.2 or 15.3 hereof with respect to any Claim unless written notice of such Claim shall have been given to such Indemnifying Party on or prior to the third (3rd) annual anniversary of the Closing Date and in Environmental Matters on or prior to the fifth (5th) annual anniversary of the Closing Date.

(b)     Subject to the provisions of this Section 15.6(b), each party's responsibility to indemnify the other pursuant to Sections 15.2 or 15.3 shall be limited to claims for indemnity which, with respect to the matters set forth in Sections 6.5 and 6.7, exceed Forty Thousand Dollars ($40,000); and with respect to all other matters exceed Twenty Thousand Dollars ($20,000) in the aggregate before a party hereto may seek reimbursement for such Claims from the other.

(c)     In no event will a party's indemnity obligation under Sections 15.2 or 15.3 exceed the Purchase Price.

### ARTICLE XVI

### TERMINATION

**Section 16.1   Termination by Either Party.** Without prejudice to other rights and remedies which it may have, either party may, at its option, terminate this Agreement at any time prior to the Closing by giving notice thereof to the other party if:

(a)     A legal action or proceeding is pending against such party as of the date of such notice of termination, an unfavorable judgment, decree or order in such action or proceeding would prevent or make unlawful the consummation of the transactions

contemplated by this Agreement and an unfavorable judgment, order or decree is reasonably likely or the Department of Justice or Federal Trade Commission indicates that they will object to the transaction as structured;

(b)     any representation, warranty or covenant in this Agreement shall prove to have been incorrect, incomplete or misleading at the time it was made in any material respect;

(c)     any of the conditions precedent to the Closing, contained herein, do not occur;

(d)     the Closing of the transactions contemplated herein has not occurred March 15, 1997; or

(e)     the consequences, direct or indirect, of fire, war, flood, tornado, riot, labor disputes, or other causes beyond the reasonable control of the party charged with performance, occur, but only to the extent which such performance has been prevented by such occurrence.  In the event that either party shall be unable to perform any of its obligations as undertaken due to an event of Force Majeure, it shall promptly advise the other of its inability to perform.  In the event such inability of one party to perform shall continue for a period of thirty (30) days, then the other party shall have the right to terminate this Agreement.

### Section 16.2    Effect of Termination.

(a)     In the event of termination of this Agreement, this Agreement shall forthwith become void, subject to Section 16.2(b).  Except where this Agreement is terminated by one party due to the failure of the other to fulfill its obligations hereunder, or because any representations or warranties of the other party are incorrect, incomplete or misleading, there shall be no liability on the part of either party, or their respective officers, directors, or affiliated companies upon such termination, except as set forth in Section 16.2(b).

(b)     In the event the transactions contemplated hereby do not Close after the Chicago Transfer Date, the parties will take all action necessary to convey, transfer or assign back to Seller any Assets used in the Chicago Business that have been conveyed, transferred or assigned to Purchaser as of the Chicago Transfer Date and to place each party in the position it occupied immediately prior to the date hereof.  Any costs and expenses of Seller related to the return of the Chicago Business from Purchaser to Seller shall be borne by Purchaser (in addition to any other amounts Purchaser may be responsible to Seller for) in the event the transactions contemplated hereby do not Close due to the failure of Purchaser to obtain financing to fund the Purchase Price.  Purchaser shall also continue to indemnify Seller pursuant to Section 4.2(f) hereof for any actions or events occurring during the period between the Chicago Transfer Date and the termination hereof.

**Section 16.3  DOJ Caused Termination.**  The parties acknowledge that the transactions contemplated by this Agreement are being undertaken pursuant to the Final Judgment described in the third Whereas paragraph of this Agreement and that the United States Department of Justice ("DOJ") has the authority to withhold its consent to the transactions set forth herein at any time after the date hereof. If the DOJ objects to the terms hereof, whether after the date hereof, after the Chicago Transfer Date or after the Closing, the parties agree to use their reasonable best efforts to either reform the transaction to meet the DOJ's objections, or, if such reformation cannot be made to the parties' satisfaction, to take all actions necessary to place each party in the position it occupied with respect to the Chicago Business, Sunbeam Business and the Assets immediately prior to the date hereof.

## ARTICLE XVII

## TRANSFER TAXES

**Section 17.1  Transfer Taxes.**  Purchaser shall be responsible for paying all sales, use and other transfer Taxes and fees (including, without limitation, recording fees and Taxes) incurred in connection with the transfer of the Assets to Purchaser and shall cooperate with Seller in making appropriate and timely Tax and fee payments to the taxing authorities.

## ARTICLE XVIII

## MISCELLANEOUS

**Section 18.1  Notices.**  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed duly given if and when delivered personally or sent by certified mail (return receipt requested), postage prepaid, by facsimile, or by overnight courier:

| To Seller: | Interstate Bakeries Corporation |
| | 12 East Armour Boulevard |
| | P.O. Box 419627 |
| | Kansas City, MO 64141 |
| | Attention: Ray Sandy Sutton, Esq. |
| | Fax: (816) 502-4126 |
| | |
| With a copy to: | Shook, Hardy & Bacon L.L.P. |
| | One Kansas City Place |
| | 1200 Main Street |
| | Kansas City, MO  64105 |
| | Attention: Jennings J. Newcom, Esq. |
| | Fax: (816) 421-5547 |

.

To Purchaser:                    Lewis Brothers Bakeries, Incorporated
                                 500 N. Fulton Avenue
                                 Evansville, IN 47710-1571
                                 Attention: R. Jack Lewis, Jr.
                                 Fax: (812) 425-7609

or to such other address as either party may notify the other party in writing.

          **Section 18.2    Expenses.** Each party hereto shall bear all of its own costs, fees and expenses in connection with the transactions contemplated hereby. The provisions of this Section 18.2 shall survive the Closing hereunder and any termination of this Agreement.

          **Section 18.3    Public Announcement.** No press release or other public announcement, or notice to or other communication with either party's distributors, dealers, suppliers, customers, employees or stockholders relating to the transactions contemplated by this Agreement shall be made or given prior to the Closing without the prior written consent of the other party, except as may be required by law or the New York Stock Exchange.

          **Section 18.4    Books and Records.** Purchaser shall provide Seller with reasonable access to the books and records of the Chicago Business and Sunbeam Business for a period of five (5) years after Closing as required by Seller to comply with any tax, accounting or legal obligations that arise after Closing but relate to pre-Closing activities.

          **Section 18.5    Assignment.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party hereto may assign any of its rights hereunder without the prior written consent of the other party hereto, except to a wholly-owned subsidiary that agrees to be bound by the terms and conditions hereof.

          **Section 18.6    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to the conflict of law provisions thereof.

          **Section 18.7    Waiver and Amendment.** Except as otherwise expressly provided herein, no provision hereof may be waived, amended or otherwise modified except by a written agreement signed by each party hereto.

          **Section 18.8    Entire Agreement.** This Agreement, together with the exhibits and schedules hereto, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating thereto.

          **Section 18.9    Knowledge.** When used herein, "knowledge" shall mean (i) with respect to an individual, "knowledge" of a particular fact or other matter if such individual is aware of such fact or other matter or (ii) with respect to a person (other than an individual), "knowledge" of a particular fact or other matter if any individual who is serving as a director, officer, executive

or managerial employee of such person or in any similar capacity is aware of such fact or other matter.

**Section 18.10 Confidentiality.** On and after the date hereof, Seller and Purchaser shall keep this Agreement and the transaction contemplated hereby confidential and shall only disclose it to their respective senior management and professional advisors on a confidential basis at all times prior to the issuance of mutual information releases, if any.

**Section 18.11 Headings.** The headings of this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

**Section 18.12 Severability.** If all or any portion or provision of this Agreement shall to any extent be held invalid or unenforceable in whole or in part by a court or agency having valid jurisdiction pursuant to a valid decision or decree, then the parties hereto expressly agree to be bound by any lesser covenant imposing the maximum legal duty permitted by law that is subsumed within the terms of such covenant, as if the resulting covenants were separately stated in and made a part of this Agreement, and the remainder of this Agreement shall remain in full force and effect.

**Section 18.13 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**Section 18.14 Time.** Time is of the essence in connection with the performance of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first set forth above.

**INTERSTATE BRANDS CORPORATION**

By: _____

Name: Ray Sandy Sutton

Title:   Vice President, Corporate Secretary and
General Counsel

**LEWIS BROTHERS BAKERIES INCORPORATED**

**CHICAGO BAKING COMPANY**

By: _____

Name: R. Jack Lewis, Jr.

Title:   President